Charles J. BUFALINO, Jr.,
Plaintiff-Appellant,

v.

The ASSOCIATED PRESS,
Defendant-Appellee.

No. 55, Docket 82–7256.

United States Court of Appeals,
Second Circuit.

Argued Sept. 1, 1982.
Decided Oct. 27, 1982.

Thomas A. Rothwell, Washington, D.C. (Randolph J. Seifert, New York City, of counsel), for plaintiff-appellant.

Richard N. Winfield, New York City (Rogers & Wells, Louise Sommers, New York City, of counsel), for defendant-appellee.

Before LUMBARD, CARDAMONE and WINTER, Circuit Judges.

LUMBARD, Circuit Judge:

Charles J. Bufalino, Jr. appeals from a grant of summary judgment to the Associated Press (AP) in his diversity action for defamation against AP. Judge Werker of the Southern District of New York granted AP summary judgment on both of two independent grounds. First, he held that AP's published statements about Bufalino were not actionable under the "fair report privilege" recognized by Pennsylvania law. Second, after finding that Bufalino was a public official and that AP had not acted with malice, he held Bufalino's action barred under the constitutional "malice" standard of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). We reverse the grant of summary judgment on both grounds and remand for further proceedings.

Appellant is a member of the Pennsylvania bar who resides and practices law in West Pittston, Pennsylvania, a community of some 7,000 to 8,000 persons in the Scranton-Wilkes-Barre area of northeastern Pennsylvania. In addition to his private practice, appellant is employed by the Borough of West Pittston in the part-time, appointive position of Borough Solicitor. As Borough Solicitor appellant attends meetings of the Borough Council (the legislative body for West Pittston) and, upon request, advises the Council on legal matters. He is compensated from the Borough budget at approximately $3,500 per year. Appellant claims that two reports prepared by AP (a New York corporation) and published in certain Pennsylvania newspapers in December 1978, defamed him with consequent damage to his personal and professional lives. These reports identified appellant as a person "with alleged mob ties."

Appellant commenced this action with the filing of a complaint on November 30, 1979. AP served its answer on December 24, 1979. Following discovery by both parties, AP moved for summary judgment on June 10, 1980. Judge Werker granted AP's motion in an opinion filed on January 28, 1982.

Judge Werker assumed certain facts to be true in rendering summary judgment for the defendant. While plaintiff disputes some of these facts, we also will assume them to be true for purposes of this appeal so that the correct legal standard may be established prior to trial. At trial plaintiff will be free to put his version of the facts to the trier. We therefore state the facts as follows.

On December 7, 1978 Pennsylvania Governor-elect Richard L. Thornburgh released

a list of contributors to his election campaign. Paul Carpenter, then a newsman in the Harrisburg office of AP, reviewed the list that day. Carpenter recognized the name "Bufalino" as a result of previous reporting work in the areas of law enforcement and organized crime. He researched the backgrounds of the individuals whose names he recognized to confirm information about them and to obtain additional information for a news report. He consulted materials released by the Pennsylvania Crime Commission (a public investigatory body without enforcement powers), including its 1970 Report on Organized Crime. He consulted AP files and his own working files. He reviewed newspaper articles which reported that William E. Bufalino, Sr., a Detroit lawyer, was a cousin and criminal associate of Russell Bufalino, a reputed Mafia leader.[1] He next contacted two other reporters believed by him to be reliable and knowledgeable in the area of organized crime. One reporter told him that appellant and Russell Bufalino were related, and the other told him that he was "pretty sure" they were related.

Carpenter also telephoned personnel at the Pennsylvania Crime Commission to verify his information. Two Commission employees, described by Carpenter as "officials," informed Carpenter that appellant was related to Russell Bufalino. The Commission had previously identified Russell Bufalino as a Mafia leader. A third Commission employee (or "official") told Carpenter that in his private practice appellant represented individuals suspected of having connections with organized crime. Carpenter agreed with the "officials" not to reveal their identity, and he has not done so. At a pre-trial deposition Carpenter stated that the word "officials," as he used it, could refer not only to members of the Commission, but also to various officers and agents of the Commission.

After obtaining this information, Carpenter prepared a story on the campaign fund disclosures for transmission to morning newspapers in Pennsylvania. Robert Dvorchak, in charge of AP's Harrisburg bureau, reviewed the story and asked Carpenter about the sources of his information for each individual named in the story. The story was then transmitted to AP's Philadelphia Bureau on the evening of December 7, 1978.

As reported in the *Scranton Times* on December 8, 1978, and in the *Wilkes-Barre Times-Leader Evening News* on December 9, 1978, the story stated:

> Harrisburg (AP)—Governor-elect Richard L. Thornburgh, who rose to fame by battling organized crime, accepted political contributions from several individuals with alleged mob ties, according to his campaign records . . .
>
> Among the 14,000 contributors listed by Thornburgh were:
>
> . . . . Charles Bufalino Jr., an attorney who is related to Russell Bufalino, described by the Crime Commission as a Mafia boss. He gave $120.

On December 8, 1978, Dvorchak prepared a follow-up story incorporating the response of Governor-elect Thornburgh's press secretary to the original article. This follow-up story was transmitted by AP's Harrisburg bureau to other AP members on December 8th and 9th. As reported in the *Scranton Times* on December 9, 1978, and in the *Wilkes-Barre Times-Leader Evening News* on December 13, 1978, this story stated:

> Harrisburg (AP)—Governor-elect Richard L. Thornburgh will return campaign contributions to three individuals who allegedly have ties to organized crime figures. . . .
>
> . . . .
>
> "We are looking into whether Bufalino has documentable links to organized crime, but as of today we have been unable to determine that," . . . .
>
> . . . .

---

1. Russell Bufalino and this court have not been strangers to each other. *See United States v. Bufalino,* 683 F.2d 639 (2d Cir.1982); *United States v. Bufalino,* 576 F.2d 446 (2d Cir.), *cert.* denied, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978); and *United States v. Bufalino,* 285 F.2d 408 (2d Cir.1960).

Bufalino, an attorney, is related to Russell Bufalino, identified by state and federal investigative agencies as a Mafia boss now in prison.

. . . .

But [Thornburgh's press secretary] said Bufalino's mere family ties . . . do not warrant returning . . . Bufalino's $120 contribution.

■ Appellant bases his action for defamation upon the two stories quoted above. To establish liability for defamation under Pennsylvania law, the plaintiff must prove both the defamatory character of the defendant's communication and the recipient's understanding of its defamatory meaning. 42 Pa.Cons.Stat.Ann. § 8343(a) (Supp.1981). The Pennsylvania Supreme Court has stated that the court is to determine, in the first instance, whether the communication complained of is capable of a defamatory meaning. *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 442, 273 A.2d 899, 904 (1971). If the court concludes that the communication may have a defamatory meaning, the jury is to determine whether it was so understood by the recipient. Our initial inquiry, therefore, is whether AP's statements about appellant are susceptible of a defamatory meaning. The Pennsylvania Supreme Court has adopted the definition of defamation set forth in § 559 of the original Restatement of Torts. *Birl v. Philadelphia Electric Co.,* 402 Pa. 297, 167 A.2d 472 (1969).[2] We therefore must evaluate AP's statements in light of § 559, which defines a defamatory communication as one that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." We have no doubt that under this test AP's statements about appellant are susceptible of a defamatory meaning. A description of an individual as a person "with alleged mob ties" may well lower the community's estimation of that person and deter others "from associating or dealing with him." It

is true that AP's statement of a family relationship between appellant and Russell Bufalino may not in itself be defamatory. A mere imputation of family relationship generally is not actionable. However, Governor-elect Thornburgh's prompt decision to return the campaign contributions of certain persons named in the articles is strong evidence of the meaning most readers would attribute to the phrase "alleged mob ties." We conclude that taken together AP's stories *could* have a defamatory meaning, and that appellant therefore satisfied his initial burden of proof.

■ Defamatory communications are not actionable, however, if protected by privilege. Among the privileges recognized by Pennsylvania is a privilege for the "fair and accurate" reporting of official records and proceedings. The scope of this privilege in Pennsylvania is open to debate. Although in several decisions the Pennsylvania Supreme Court adopted as the law of the state the fair report privilege set forth in § 611 of the original Restatement of Torts, *see Binder v. Triangle Publications, Inc.,* 442 Pa. 319, 324, 275 A.2d 53, 56 (1971); *Purcell v. Westinghouse Broadcasting Co.,* 411 Pa. 167, 177, 191 A.2d 662, 667 (1963); *Sciandra v. Lynett,* 409 Pa. 595, 600, 187 A.2d 586, 589 (1963), no Pennsylvania court has yet considered the significance of the amendments made to § 611 in the Restatement (Second) of Torts. We agree, however, with Judge Werker that the fair report privilege contained in § 611 of the Second Restatement embodies present Pennsylvania law. We note first the expressed willingness of the Pennsylvania Supreme Court to adopt sections of the Second Restatement where the Restatement differs from or supplements Pennsylvania common law. *Gilbert v. Korvette, Inc.,* 457 Pa. 602, 611 n. 25, 327 A.2d 94, 100 n. 25 (1974). Second, we note that significant federal authority treats § 611 of the Second Restatement as the law of Pennsylvania. *See Medico v. Time, Inc.,* 643 F.2d 134, 138 (3d

**2.** Section 559 of the Restatement (Second) of Torts makes no amendments to § 559 of the

original Restatement.

Cir.), *cert. denied,* 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981); *Hanish v. Westinghouse Broadcasting Co.,* 487 F.Supp. 397 (E.D.Pa.1980); *Mathis v. Philadelphia Newspapers, Inc.,* 455 F.Supp. 406, 415 (E.D.Pa.1978). We therefore believe that Pennsylvania law is accurately stated in § 611 of the Second Restatement, which provides:

> The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

■ AP claims that its stories are protected by this privilege. Judge Werker agreed, and granted AP summary judgment under § 611. The judge granted summary judgment because he concluded that AP's statements about appellant constituted "fair and accurate" reports of information contained in official records. We reverse the grant of summary judgment because the record does not show that AP actually relied upon the official records which it now claims it accurately summarized in its stories.

In relevant part, Judge Werker read appellant's complaint to complain of two statements in the stories: 1) that appellant is related to Russell Bufalino; and 2) that appellant allegedly has ties to organized crime.[3] In Judge Werker's view both of these statements are privileged because each is supported by official records.

AP's first statement, said Judge Werker, was adequately supported by (a) an FBI memorandum of July 20, 1956 that identified appellant as a cousin of Russell Bufalino; (b) the statement by Crime Commission "officials" to Carpenter that appellant is related to Russell Bufalino; and (c) by several other documents, including a U.S. Senate Report and testimony in deportation proceedings which establish a family rela-

tionship between appellant's father (Charles J. Bufalino, Sr.) and uncle (William Bufalino) and Russell Bufalino, and hence inferentially between appellant and Russell Bufalino. AP makes no claim that it relied on any of these sources other than source (b) at the time it circulated its stories in December, 1978.

Judge Werker found that AP's second statement was adequately supported by the documents establishing a family relationship between Russell Bufalino and appellant, and by the statement of the Crime Commission "official" to Carpenter that appellant represented underworld figures in his law practice. Judge Werker ruled that the statement that appellant had "alleged mob ties" was a fair and accurate summary of all of this official information. AP additionally cites to this Court a number of other official records which, it argues, further establish financial, family, and social ties between appellant and persons identified by state and federal officials as participants in organized crime. Not relied upon by Judge Werker, these "records" include depositions in the present trial, land filings, and records of other judicial proceedings. They suggest that appellant knows and considers himself friendly to a number of suspected mobsters, and that, as an attorney, he has represented their interests in both civil and criminal proceedings. Even were we to accept the accuracy of these additional records, it is apparent that AP did not rely upon them in preparing its reports, but instead discovered them in preparation for the present litigation.

We believe that the lack of reliance is dispositive of the issue of privilege. Judge Werker held that actual reliance upon official records or documents is not a pre-requisite to application of the fair report privilege. Instead, he ruled, an accurate summary of official reports is privileged even if the reports were not relied upon and the accuracy of the summary is mere coinci-

---

**3.** Judge Werker also read appellant's complaint to complain of the statement that Russell Bufalino has been identified by state and federal officials as a Mafia boss. We need not decide the application of the fair report privilege to this statement because it is obvious that a statement identifying Russell Bufalino as a mobster does not defame appellant.

dence. As authority for this ruling the Judge cited *Medico v. Time, Inc.,* 643 F.2d 134, 146–47 (3d Cir.), *cert. denied,* 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981). In *Medico,* the plaintiff argued that the defendant could claim the § 611 privilege only if, in preparing its report, it had actually relied upon the official document in question. The Third Circuit, citing *Binder v. Triangle Publications,* 442 Pa. 319, 275 A.2d 53 (1971), held for the defendant and stated that Pennsylvania law "squarely contradicts" the argument that actual reliance is necessary.

We believe that *Medico* reads *Binder* for much more than it's worth. In *Binder,* the Pennsylvania Supreme Court held the privilege available where the defendant's reporter, who did not attend a judicial proceeding, based his report of the proceeding on statements given him by a third party who did attend. Said the Pennsylvania Court: "[H]ow a reporter gathers his information concerning a judicial proceeding is immaterial provided his story is a fair and substantially accurate portrayal of the events in question." 442 Pa. at 327, 275 A.2d at 58. Taken in context, we believe this statement means only that the privilege is available where a reporter who purports to report on an official proceeding does not have personal knowledge of the proceeding but instead relies on an intermediary who does. That is, in *Binder* the reporter ultimately relied on information obtained at the official proceeding, he believed he was relying on official information, and he wrote a report purporting to summarize the proceeding. In contrast, if *Medico* is correct in holding that reliance is not required, a reporter's unsubstantiated defamatory statements, made independent of any report of public proceedings, would be privileged if after-the-fact the reporter could find some official record embodying his statements. We do not believe that the privilege should be applied to the latter situation. The privilege is intended to facilitate media reporting of official proceedings so that the public may be informed. *See* Comment *a* to § 611 ("The basis of this privilege is the interest of the public in having information made available to it as to what occurs in official proceedings and public meetings.") By immunizing from defamation liability accurate reports of newsworthy events, the privilege helps to ensure media dissemination of official records containing potentially defamatory material. In so doing, the privilege serves an important public policy. *See Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 495, 95 S.Ct. 1029, 1046, 43 L.Ed.2d 328 (1975) ("Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media.") However, the privilege cannot be divorced from its underlying policy of encouraging the broad dissemination of public records. The rule applied by the District Court does not serve that policy because it does nothing to encourage the initial *reporting* of public records and proceedings. Certainly § 611 should not be interpreted to protect unattributed, defamatory statements supported after-the-fact through a frantic search of official records. For where the media does not directly or indirectly rely upon official records, the policy underlying the privilege is inapplicable and the privilege itself should not be applied.[4] We thus conclude that AP is not entitled to summary judgment on the basis of records upon which it did not actually rely.

AP claims that it did actually rely upon certain official statements, namely the statements made to Carpenter by the Crime Commission "officials." In the present state of the record, however, AP cannot rely upon those statements as a basis for application of the § 611 privilege. Carpenter has honored his agreement not to identify the persons with whom he spoke, whom he describes as "officials." We have absolutely no quarrel with AP's contention that under Pennsylvania law AP cannot be com-

---

**4.** Moreover, even where the reporter has actually relied on official records, the privilege can be lost through failure to make proper attribution. *See Hughes v. Washington Daily News Co.,* 90 U.S.App.D.C. 155, 193 F.2d 922 (1952).

pelled to reveal the identities of Carpenter's interlocutors. Pennsylvania's "Shield Law," 42 Pa.Cons.Stat.Ann. § 5942(a) (1982) protects reporters from compelled disclosure of their sources in any legal proceeding or trial. This statute has been broadly construed by the Pennsylvania courts, see In re Taylor, 412 Pa. 32, 193 A.2d 181 (1963), and is clearly operative in the present case. See Mazzella v. Philadelphia Newspapers, Inc., 479 F.Supp. 523, 527 (E.D.N.Y.1979) (Shield Law is not restricted to cases in which newspaper or reporter is not a party.) However, it is one thing to say that AP cannot be compelled to reveal Carpenter's sources and quite another to say that AP can simultaneously base its claim to the § 611 privilege upon the statements of those sources. Obviously the latter cannot be true. Only reports of *official* statements or records made or released by a public agency are protected by the § 611 privilege. Statements made by lower-level employees that do not reflect official agency action cannot support the privilege. *See, e.g., Phillips v. Evening Star Newspaper Co.,* 424 A.2d 78, 89 (D.C.App.1980), *cert. denied,* 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981). Without knowledge of the identities of the persons to whom Carpenter spoke, it is impossible to say whether their statements constituted official action within the scope of the privilege. We see nothing in Pennsylvania law which requires us to give AP the benefit of the doubt on the issue of the identities of Carpenter's sources. Nor do we believe that our holding will defeat the purpose of the Shield Law to ensure a free flow of information to the media by protecting reporters from compelled disclosure. AP still may withhold the identifies of Carpenter's sources and still may rely upon their alleged statements in its defense. In fact, our ruling does nothing more than recognize that a proponent cannot rely upon a privilege if he fails to prove all of its necessary elements.

We therefore reverse the grant of summary judgment to AP on the basis of the § 611 privilege.

Judge Werker also based his . grant of summary judgment to AP on the constitu-

tional "malice" standard of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Under *New York Times,* a "public official" may not recover for a defamatory statement related to his official conduct unless he proves that the defendant made his statement with " 'actual malice'—that is, with knowledge that (the statement) was false or with reckless disregard of whether it was false or not." 376 U.S. at 280, 84 S.Ct. at 726. Judge Werker concluded as a matter of law that as Borough Solicitor of the Borough of West Pittston appellant was a "public official." He further concluded that appellant had failed to raise a material issue of fact suggesting that AP had acted with malice.

█ Appellant does not challenge Judge Werker's finding that AP did not act with malice. Instead, relying upon *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), he argues that he does not occupy a position of sufficient responsibility in government to be classified as a public official. He also argues that the public official doctrine is inapplicable because AP's statements did not directly involve the performance of his duties as Borough Solicitor. AP counters that appellant indeed is a public. official under the Supreme Court's definition of that term in *Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). In *Rosenblatt,* the Supreme Court stated that the term "public official" extends "at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." 383 U.S. at 85, 86 S.Ct. at 675. AP further argues that a town attorney's alleged mob ties "touch on" his fitness for office and hence are covered by the public official doctrine. *See Garrison v. Louisiana,* 379 U.S. 64, 77, 85 S.Ct. 209, 217, 13 L.Ed.2d 125 (1964). Because we believe that both parties' arguments fail to address a crucial issue in this case, we find it unnecessary to decide whether a part-time appointed small-

town attorney is a public official,[5] or whether AP's statement in fact implicated appellant's fitness for office. Instead, we hold that, upon the present record, AP is presumptively precluded from relying upon the *New York Times* malice standard because its stories did not identify appellant as the holder of a public office.

Neither of AP's stories identified appellant as the Borough Solicitor of West Pittston or as the holder of any public office. The stories described appellant merely as "an attorney." A reader without prior knowledge of appellant's status as Borough Solicitor would most likely, and correctly, assume from the description that appellant is engaged in the private practice of law. The description would not directly or impliedly inform the reader that appellant holds any public office. We conclude that the public official doctrine is not available where the defendant's statements do not directly or impliedly identify the plaintiff as a public official, and there is no showing that the plaintiff's name is otherwise immediately recognized in the community as that of a public official.

In *Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), the Supreme Court identified the important interests which underlie the public official doctrine adopted in *New York Times.* "There is, first," said the Court, "a strong interest in debate on public issues, and, second, a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues." 383 U.S. at 85, 86 S.Ct. at 675. These interests are not served by defamatory statements which do not identify their subject as a public official. Such statements cannot foster debate on public issues or officials for the simple reason that those who read or hear the statements are never informed of the statements' relation to matters of public concern. At the same time, the statements may significantly and adversely affect the defamed individual's personal and professional lives. Under these circumstances, we believe that the second important policy identified by the *Rosenblatt* court, namely, society's "pervasive and strong interest in preventing and redressing attacks upon reputation," 383 U.S. at 86, 86 S.Ct. at 676, must prevail over the defendant's right to require proof of malice. We therefore hold that appellant is in the position of a private individual and under Pennsylvania law, *see infra,* may recover for defamatory statements upon proof of mere negligence. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

Of course, in some cases an individual's status as a public official may be so widely known throughout the community that a direct or indirect identification of the individual as a public official will be unnecessary to application of the doctrine. A defamatory statement which identifies the President of the United States, or a state governor, by name only, would still fall under the doctrine because the status of such persons as public officials is common knowledge. Similarly, the doctrine would apply to statements about an official of far lesser stature if the statements are broad-

---

5. Some cases have held that city, village, and municipal attorneys, even those retained part-time or only in connection with specific matters, are public officials. *See, e.g., Finkel v. Sun Tattler Co.,* 348 So.2d 51 (Fla.App.1977), *cert. denied,* 358 So.2d 135 (Fla.1978); *Frink v. McEldowney,* 29 N.Y.2d 720, 325 N.Y.S.2d 755, 275 N.E.2d 337 (1971); *Ewald v. Roelofs,* 120 Ill.App.2d 30, 256 N.E.2d 89 (1970). However, we have serious doubts that the First Amendment rights of the press require application of the public official doctrine to persons holding positions such as that of Borough Solicitor of the Borough of West Pittston. Obviously not every government employee is a public official under *Rosenblatt.* Is the public interest in the qualifications of a part-time, appointed town counsel really so great that the counselor must suffer defamation with little prospect of redress? The public certainly has an interest in the qualifications of such minor town officials, yet it also has an interest in the continued willingness of such persons to devote their time and efforts to civic affairs. As the author of one treatise has perceptively noted, *see* L. Eldredge, *The Law of Defamation* § 51 at 271–72, extension of the public official doctrine beyond its intended scope could well result in the loss to the community of the services of its most talented citizens.

cast in the area within the official's jurisdiction and a significant portion of the population in that area would recognize the official's public status from his name alone. It suffices that in the present case AP has made no showing of the degree to which West Pittston residents recognize appellant, by name, as the holder of a public office. We therefore hold that as the record presently stands the public official doctrine does not apply to this case.

The Supreme Court has not yet ruled upon the significance of a news report's failure to identify a public officeholder as such. *See Ocala Star-Banner Co. v. Damron,* 401 U.S. 295, 300 n. 4, 91 S.Ct. 628, 632 n. 4, 28 L.Ed.2d 57 (1971). Other courts, however, have reached the same conclusion we reach here. *See Foster v. Laredo Newspapers, Inc.,* 541 S.W.2d 809, 815–16 (Texas 1976), *cert. denied,* 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977); *Ocala Star-Banner Co. v. Damron,* 221 So.2d 459 (Fla. App.1969), *appeal dismissed,* 231 So.2d 822 (Fla.1970), *rev'd on other grounds,* 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971). To the extent other decisions have taken a contrary position, *see Goodrick v. Gannett Co.,,* 500 F.Supp. 125 (D.Del.1980); *Stone v. Essex County Newspapers, Inc.,* 367 Mass. 849, 330 N.E.2d 161, 171 (1975), we disagree.

■ Finally, AP asks us to hold that Pennsylvania law requires appellant to prove malice. AP relies upon *Matus v. Triangle Publications, Inc.,* 445 Pa. 384, 286 A.2d 357 (1971), *cert. denied,* 408 U.S. 930, 92 S.Ct. 2494, 33 L.Ed.2d 343 (1972), in which the Pennsylvania Supreme Court held that liability may be imposed for defamatory falsehoods related to matters of public interest only upon proof of actual malice. *Matus,* however, was decided in the interval between *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), in which a plurality of the Supreme Court held that private figure plaintiffs must prove actual malice if the defamatory communication involves a matter of public concern, and *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), in which the Supreme Court held that states may permit private figure plaintiffs to recover merely upon proof of "actual fault." The question before us is whether Pennsylvania continues to adhere to the rule adopted in *Matus* in light of *Gertz.* The Pennsylvania Supreme Court has not considered this question and the issue, therefore, remains unsettled. *See Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 272 (3d Cir.1980); *Lorentz v. Westinghouse Electric Corp.,* 472 F.Supp. 946, 953 n. 6 (W.D.Pa.1979). We believe, however, that if confronted by the question the Pennsylvania Supreme Court would reject *Matus* and permit private figure plaintiffs to recover upon proof of negligence. We note that the large majority of state courts which have decided private figure cases following *Gertz* have adopted a negligence standard. *See Denny v. Mertz,* 106 Wis.2d 636, 651 n. 20, 318 N.W.2d 141, 148 n. 20 (1982) and cases cited therein. More particularly, we are persuaded by the reasoning of Judge Luongo in *Mathis v. Philadelphia Newspapers, Inc.,* 455 F.Supp. 406, 410–12 (E.D.Pa.1978), that *Matus* no longer represents the law of Pennsylvania. *Accord, Marcone v. Penthouse Intl., Ltd.,* 533 F.Supp. 353, 360–61 (E.D.Pa.1982); *Medico v. Time, Inc.,* 509 F.Supp. 268, 277 n. 7 (E.D.Pa.1980), *affd.,* 643 F.2d 134 (3d Cir.), *cert. denied,* 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981). We therefore hold that Pennsylvania law does not require appellant to prove "actual malice."

Reversed and remanded.