SIXTH DIVISION
January 12, 2007

No. 1-03-1307

| | | |
|---|---|---|
| ALEX R. SEITH, | ) | Appeal from the |
| | ) | Circuit Court |
| Plaintiff-Appellant, | ) | of Cook County. |
| | ) | |
| v. | ) | No. 02 L 5830 |
| | ) | |
| CHICAGO SUN-TIMES, INC., and | ) | |
| STEVE NEAL, | ) | Honorable |
| | ) | Michael J. Hogan, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE O'MALLEY delivered the opinion of the court:

On May 7, 2002, plaintiff Alex R. Seith filed a two-count complaint alleging that an article written by the late Steve Neal and published by Chicago Sun-Times, Inc., contained statements which constituted *per se* libel and false-light invasion of privacy. Defendants moved to dismiss pursuant to section 2-615 of the Illinois Code of Civil Procedure. 735 ILCS 5/2-615 (West 2004). The circuit court of Cook County granted defendants' motion to dismiss.

Plaintiff filed timely notice of appeal. On appeal, plaintiff asserted that his complaint stated a claim upon which relief could be granted. After the parties fully briefed these issues, plaintiff filed a motion to voluntarily dismiss the appeal as to defendant Steve Neal. That motion also stated plaintiff's intention to continue the matter against Chicago Sun-Times, Inc. This court granted plaintiff's motion and a mandate issued pursuant to that order.[1] After a period of

---

[1]Although the late Mr. Neal is no longer part of this litigation, we continue to use a caption that reflects his prior status in this case owing to our practice of following the format of the caption used in the notice of appeal.

time without a decision, plaintiff filed a motion requesting that this court grant oral argument on this case. The remaining defendant filed an objection to plaintiff's motion alleging, *inter alia*, that this court lacked jurisdiction to decide this case. For the reasons stated below, we assert our jurisdiction over this case and affirm the judgment of the circuit court. Contemporaneously with this order we deny plaintiff's motion requesting oral argument.

BACKGROUND

Alex Seith sued Chicago Sun-Times, Inc., and columnist Steve Neal for libel and false-light invasion of privacy for a column published in the "Commentary" section of the Chicago Sun-Times newspaper of February 18, 2002. In paragraphs 4, 5, and 6 of the first count of his complaint, Mr. Seith alleged that Neal authored a libelous article, subsequently published by Chicago Sun-Times, Inc., in its daily paper, entitled "Underdog Wood Goes for Rose" (the Rose column). Seith attached a copy of the article to his complaint as an exhibit. The article describes how then-Lieutenant Governor Corrine Wood, a hopeful for the Republican nomination for the gubernatorial race, had hired political strategist Don Rose to assist her in her campaign. We quote the entire article and italicize the portion of the article that Mr. Seith alleges was defamatory:

"UNDERDOG WOOD GOES FOR ROSE

Steve Neal

Can he do it again? Independent Don Rose, the strategist behind Jane

Byrne's great upset of 1979, is taking on another race that looks unwinnable.

Rose, 71, who has a well-earned reputation for turning lost causes into

2

victories, is joining Corinne Wood's GOP campaign for governor.

According to the most recent polls, Wood is trailing Attorney General Jim Ryan by more than 30 percentage points. Rose acknowledges that Wood is the underdog. But he argues that she has the potential to win the March 19 primary.

The Wood campaign wasn't Rose's only option. At least two of the three Democratic gubernatorial hopefuls also wanted his help. But Wood made the most compelling pitch for his involvement. Rose will be shaping her message in the campaign's final weeks and also will seek to expand her political base.

To make a serious run for the GOP nomination, the socially liberal Wood knows that she must attract independent and Democratic crossover votes. Wood focused on Rose because of his track record in forging bipartisan, multiethnic coalitions for Republican candidates.

It has been 30 years since Rose managed Republican Bernard Carey's victory over Democratic Cook County State's Attorney Edward Hanrahan. The predominant issue was Hanrahan's involvement in the infamous police raid on the Black Panthers in which Fred Hampton was gunned down in his sleep.

Rose created a strategy that took advantage of Hanrahan's vulnerabilities. Lakefront independents, liberal Democrats, and African Americans voted for Carey in large numbers, which resulted in the GOP's first victory for this office since the 1950s. Under Rose's direction, Carey in 1976 became the first Republican state's attorney to win re-election since the 1920s.

Wood is hoping that Rose can build a similar coalition for the March 19 GOP primary. More than 50,000 Democrats and independents have already been contacted by the Wood campaign as part of an effort to win crossover votes. Rose notes that John McCain won the 2000 Michigan GOP presidential primary with Democratic and independent crossover votes.

Under Illinois election law, there is no party registration, and voters have the option of casting either a Republican or Democratic ballot. Rose said that pro-choice voters may rally behind Wood to assure that the state's next governor will support a woman's right to reproductive choice. GOP front-runner Ryan and gubernatorial contender Patrick O'Malley oppose abortion, even in cases of rape or incest. O'Malley and Ryan would allow abortions to save the mother's life.

Rose, who will hit Ryan hardest on the abortion issue, also will tout Wood's accomplishments as a state legislator and as lieutenant governor. Just as he made history in helping to elect Byrne the first female mayor of Chicago, Rose wants to break the glass ceiling again by making Wood the first woman governor of Illinois.

*Among the other Republicans for whom Rose has worked are former Sen. Charles H. Percy and former Gov. Jim Edgar. In 1978, Rose helped Percy win a tough re-election contest over conservative Democrat Alex Seith. Rose bought ads throughout the state that reprinted the late Sun-Times columnist Mike Royko's column about Seith's ties to the mob-linked 1st Ward.* Rose and Royko

4

contributed significantly to Percy's come-from-behind win over Seith.

After Edgar was appointed secretary of state in 1980 to fill out an unexpired term, Rose became his media strategist. It was because of Rose that Edgar gained the endorsements of most independent and good-government organizations in his 1982 bid for a full term against Democratic Machine stalwart Jerry Cosentino.

Edgar's first commercial, produced by Rose, touched on themes that attracted Democratic and independent votes. Even though 1982 was a Democratic year nationally, Edgar easily won that race with Rose's help.

Rose, who has spent much of his political career battling the Democratic Machine, can do more with less resources than any strategist I've known. That's why Wood signed up the miracle worker."  S. Neal, Underdog Wood Goes For Rose, Chicago Sun-Times, February 18, 2002.

In paragraph 7 of his complaint, Seith alleges that the above-indicated portion of the Rose article was false "in that: a. Seith does not now have, and has never had, any 'ties to the mob-linked 1st Ward[,] and b. [t]he Royko column to which the 2/18/02 Neal column referred did not assert that Seith had 'ties to the mob-linked 1st Ward.' "

In paragraphs 8 and 9 of his complaint, Seith alleges that he is a public official, an attorney, and a lobbyist, and that the Rose article "impute[s] to the plaintiff a want of integrity in the discharge of his public office and also prejudice[s] him in his profession."

In paragraph 10, Seith alleged that the defendants published the purportedly defamatory

statements "of and concerning Seith with knowledge of their falsity or with a reckless disregard for the truth." Seith alleged that on October 30, 1996, another Neal column, entitled "Blind Ambition" (the Ambition column) contained similar negative comments. In paragraph 11, Seith alleged that he had refuted the assertions in that column through a letter to the editor. Seith attached an imperfect copy of the Ambition column and his response letter to the complaint. We quote both exhibits in full here:

"BLIND AMBITION

Alex Seith and Al Salvi are running 18 years apart for the same Senate seat. Their approaches are remarkably similar.

By Steve Neal

They have more than their initials in common.

Al Salvi and Alex Seith are men of ambition.

Neither is a believer in climbing up the political ladder.

In their first runs for statewide office, 18 years apart, they sought the same seat in the U.S. Senate. Democrat Seith narrowly missed in 1978. Republican Salvi might do better next week.

Their profiles are hauntingly similar. If you liked Seith, chances are you'll love Salvi.

Both are wealthy lawyers from the suburbs. Each spent more than $1 million of their family money in their first Senate campaigns. Candidates of more modest means are restricted to accepting contributions of no more than $1,000.

6

But since there are no limits on self-contributions, Salvi and Seith took advantage of the loophole in federal election law.

Who sent these candidates?

They essentially nominated themselves.

Party loyalty isn't their thing. One began as a Democrat (Salvi) and ran for office as a Republican. The other (Seith) ran for office as a Democrat and now dabbles in GOP politics. Both supported Jimmy Carter for president in 1980. This year, Seith backed Republican Phil Gramm for president. Salvi has annoyed some of his fellow Republicans by distancing himself from GOP presidential candidate Bob Dole. The Illinois Dole cam-[the article cuts off here and resumes mid-sentence] * * * and Salvi have pledged allegiance to themselves, but not to a party.

Their campaign styles are remarkably alike. In '78, Seith aired a commercial on black radio stations that accused his opponent Sen. Charles H. Percy (R.-Ill.) of being an apologist for former Agriculture Secretary Earl Butz. The commercial then noted the racial slur that had prompted Butz's resignation from the Cabinet. Seith didn't mention that Percy [the article again cuts off here and resumes mid-sentence] * * * to call for Butz to resign. The misleading ad backfired.

Salvi has also resorted to trickery. His new television commercial is using fake newspaper headlines that assert, "Durbin rated one of the most wasteful

spenders in Congress" and "Durbin caught in congressional check-writing scandal." The ad is a sham. Salvi is even tougher on the truth than Seith.

Political candidates should be judged by the company they keep. In [date cut off], Seith was chairman of the Cook County Zoning Board of appeals. His top aide was Paul Marcy, who had been recently convicted of taking a $55,000 bribe from a builder with business before the board. Seith was among the character witnesses at Marcy's trial. Seith's top aide was the brother of Pat Marcy, a member of the Chicago crime syndicate and longtime secretary of the corrupt 1st Ward Democratic organization. Seith claimed that his ties to the Marcy brothers weren't relevant to the voters. He was just wrong.

Like Seith in '78, Salvi also has a close associate of dubious character. Former juice loan collector Nick Keller, Jr., who was convicted in 1980 of collecting loans for mob boss James Inendino, is playing an active role in Salvi's campaign. Keller is Salvi's father-in-law [cut off] * * * has worked hard in the Se[nate?] race. Keller's involvement in [cut off] * * * campaign raises serious quest[ions] about Salvi's judgment.

Ethical questions have [been?] raised about Salvi's solicitation [cut off] * * * year of special-interest money [cut off] * * * trial lawyers. He collected [cut off] * * * than $70,000 from lawyers and [cut off] * * * the only GOP state legislator [who?] didn't vote for tort reform. [Cut off] * * * recently was entwined an a n[asty?] legal dispute with a longtime [asso]ciate over the manipulatio[n cut

off] * * * stock in a radio station.

Neither Salvi nor Seith vio[lated?] the law.  But they aren't ex[actly?] straight shooters."  S. Neal, <u>Blind Ambition</u>, Chicago Sun-Times, October 3, 1996.

Seith responded to this column with a letter dated November 4, 1996, addressed to Nigel Wade, editor of the Chicago Sun-Times, which reads as follows:

"Dear Mr. Wade:

Instead of using his poison pen to smear me with misleading innuendoes and false statements, Steve Neal (column Oct. 30, 1996) should have re-read the Sun-Times and gotten his facts straight.

The last time I ran for public office - in March 1984 - was in the four-way Democratic Primary for U.S. Senate with Phil Rock, then President of the Illinois Senate; Roland Burris, then Illinois Comptroller, later Illinois Attorney General; and Paul Simon, then U.S. Congressman, now U.S. Senator.

With these outstanding competitors, the Sun-Times, in an Editorial of March 16, 1984, endorsed me.

'Democratic voters face a list of four strong candidates who . . . are all professional, all are men of ideas, are all electable", [sic] the Sun-Times wrote.

'But, Alex Seith offers programs that most fit the country's needs.  We recommend him". [sic].

'In Seith', [sic] the Sun-Times continued, 'the Democrats have a candidate

9

with a lawyer's training, a diplomat's experience, a banker's fiscal knowledge, an executive's firmness, a realist's practicality – and a politician's ability to enact sound laws'. [sic]

That does not sound at all like the person in Neal's column. Because the Alex Seith presented in that column is a fabrication of Steve Neal.

Neal says that when I first ran for U.S. Senate in 1978 I 'essentially nominated' myself. FALSE.

I was <u>endorsed unanimously</u> by the State Central Committed [sic] of the Illinois Democratic Party which helped circulate nominating petitions to get me on the ballot.

Neal says 'Seith's top aide' at the Cook County Zoning Board in 1978 was Paul Marcy. FALSE.

Marcy was not my aide, top or bottom. He was county a employee [sic] hired by the President of the Cook County Board long before the President appointed me Chairman of the Zoning Board.

Neal says I was 'among the character witnesses at Marcy's trial' for alleged bribe taking. FALSE.

I was summoned to testify about Marcy's duties at the Zoning Board. The trial transcript shows I did not in any way vouch for his character.

Neal suggests that I admitted having 'ties' not only with Paul Marcy, but also his brother, Pat (both now deceased) whom Neal describes as 'a member of

10

the Chicago crime syndicate'. FALSE AGAIN.

Neal does not - and cannot - cite any 'ties' whatsoever between me and Paul Marcy. There were no 'ties between' me and the Marcy brothers - except in Steve Neal's poison pen.

I could go on and on disproving each of Neal's misleading innuendoes and false statements.

But consider: Why is there no resemblance between the Alex Seith in Neal's column and the Alex Seith endorsed by the Sun-Times in March 1984 as a man with 'foreign policy . . . expertise" as well as "a lawyer's training, a diplomat's experience, a banker's fiscal knowledge, an executive's firmness, a realist's practicality – and a politician's ability to enact sound laws.'

That Sun-Times endorsement was six years after my 1978 campaign which is distorted beyond recognition by Steve Neal. That 1984 endorsement portrayed the real Alex Seith. Steve Neal's recent column did not.

Cordially,

Alex Seith"

In paragraph 11 of his complaint, Seith alleged that despite the fact that his letter of November of 1996 notified Neal and the Chicago Sun-Times, Inc., "of the true facts," they "repeated the false and defamatory assertions regarding Seith" in the Rose column.

In paragraph 12 of his complaint, Seith alleged that by February of 2002, his "reputation had largely recovered from the defamatory falsehoods" in the Ambition column. He further

11

alleged that "as a direct and proximate result of the publication of the 2/18/02 Neal column, Seith [had] been severely damaged in his reputation and [had] suffered emotional distress." He then requested $1 million each in compensatory and punitive damages as well as costs of his action.

In count II, Seith alleged that Neal and the Sun-Times had engaged in false-light invasion of privacy. He realleged all of the claims in count I, then further alleged that the previously identified portion of the Rose column had placed Seith in a "false light before the public," that this "false light * * * would be highly offensive to a reasonable person," and that the "defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Seith would by [sic] placed." He then again requested $1 million each in compensatory and punitive damages, plus costs of the action.

Defendants filed a "Section 2-615 Motion to Dismiss Complaint," supported by a memorandum of law. Plaintiff responded to this motion to dismiss with a memo of his own. The above-referenced Mike Royko column was not part of the plaintiff's complaint, though in plaintiff's first request for admissions, the plaintiff attached, as exhibit A, a copy of the Mike Royko column.

The circuit court granted defendants' section 2-615 motion to dismiss on April 7, 2003. The plaintiff filed a timely notice of appeal. This appeal follows.

ANALYSIS

I. Jurisdiction

On April 7, 2003, the circuit court dismissed Seith's case pursuant to section 2-615 of the Illinois Code of Civil Procedure. On May 2, 2003, plaintiff filed a timely notice of appeal. This

12

1-03-1307

court thus had jurisdiction pursuant to Illinois Supreme Court Rule 303(a). 210 Ill. 2d R. 303(a). In its response to plaintiff's motion to set this case for oral argument, the defendant Chicago Sun-Times, Inc., asserted that this court lacked jurisdiction to decide this case because a mandate issued on this case on March 17, 2004. Defendant cites Illinois Supreme Court Rule 369(b) (134 Ill. 2d 369(b)) for the proposition that once a case is decided and a mandate is filed in the circuit court, the appellate court no longer has jurisdiction over the case. See Pecora v. Szabo, 109 Ill. App. 3d 824, 827 (1982) (citing Rule 369(b), noting that "after the mandate was filed, jurisdiction was once again vested in the circuit court"). We note, however, that the order and mandate that issued in this case made it clear that the case would be continued against defendant Chicago Sun-Times, Inc., and was voluntarily dismissed only as to defendant Steve Neal. There was no final disposition as to Chicago Sun-Times, Inc. There is no question that this court still has jurisdiction over this matter pursuant to Illinois Supreme Court Rule 303(a). 210 Ill. 2d R. 303(a).

Defendant also asserts that, because over two years passed from the time the final briefs were filed in the instant case and the plaintiff's request for oral argument, the plaintiff had forgone consideration of this appeal due to the doctrines of laches and estoppel and plaintiff's purported failure to exercise due diligence. We reject this argument. It appears that the delay in the disposition of this case owes to an administrative error whereupon the instant appeal was temporarily removed from the active case list sometime after the mandate issued in March of 2004. This internal administrative situation has subsequently been corrected. The plaintiff is not to blame for the delay in the disposition of this appeal. We will not avoid consideration of the

1-03-1307

merits of this appeal predicated upon delay caused by this court.

## II. Plaintiff's Libel Claim

The trial court dismissed plaintiff's complaint pursuant to section 2-615 of the Illinois Code of Civil Procedure. 735 ILCS 5/2-615 (West 2004). On appeal, the plaintiff argues that the circuit court erred because his complaint adequately alleges a cause of action for libel.

## A. Standard of Review

We note that a motion to dismiss filed pursuant to section 2-615 attacks the legal sufficiency of a plaintiff's complaint. Bryson v. News America Publications, Inc., 174 Ill. 2d 77, 86 (1996). Our analysis is thus limited only to those facts and allegations contained within the complaint and its attachments. See Krueger v. Lewis, 342 Ill. App. 3d 467, 471-72 (2003) (noting the difference between a motion to dismiss filed under section 2-615 "where we look at only the four corners of the complaint," and a motion to dismiss filed under section 2-619 "where evidentiary material may be submitted"). Because we consider only the assertions in plaintiff's complaint and the documents appended to that complaint (including the Rose column), we cannot and will not consider the 1978 Royko column or the various other documents attached to the subsequent pleadings or the appellate briefs, which include excerpts from the May 29, 2003, edition of the Chicago Tribune, the May 6, 2003, edition of the Chicago Tribune, the Cook County zoning ordinance, the Chicago zoning ordinance, and the January 25, 2004, edition of the Chicago Sun-Times.

When examining a section 2-615 motion to dismiss, a court must accept as true all well-pleaded facts and interpret the allegations in the complaint in the light most favorable to the

14

plaintiff. Bryson, 174 Ill. 2d at 86. We will not dismiss a cause of action unless it appears that no set of facts could be proved which would entitle the plaintiff to recover. Bryson, 174 Ill. 2d at 86-87. Ultimately, "[t]he question to be determined is whether sufficient facts are contained in the pleadings which, if established, may entitle the plaintiff to relief." Stroger v. Regional Transportation Authority, 201 Ill. 2d 508, 516 (2002). We note that because this inquiry concerns a question of law, we review the circuit court's order granting the section 2-615 motion to dismiss *de novo*. Stroger, 201 Ill. 2d at 516. We further note that even though the reasoning for the circuit court's order is not contained in the record, this is immaterial. Even if the trial court's judgement was in error, this court can affirm a trial court's judgment on any grounds that are called for by the record. See City of Chicago v. Holland, 206 Ill. 2d 480, 492 (2003).

B. Defamation <em>Per Se</em> and the Innocent Construction Rule

In his complaint, the plaintiff alleges that certain statements in the Rose column would purportedly link him to organized crime in the mind of an average reader and thus are defamatory *per se* in that they imputed want of integrity and his ability to perform his professional duties as a lawyer, lobbyist, and public servant.

According to our supreme court, a statement is defamatory if it "tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with [him]." Bryson, 174 Ill. 2d at 87. To state a defamation claim, a plaintiff must present facts that a defendant made a false statement about a plaintiff, the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages. See Solaia Technology, LLC v. Specialty Publishing Co., 221 Ill.

15

2d 558, 579 (2006). Although the plaintiff in the instant case does not plead special damages, it is well established that if a plaintiff alleges that a statement is defamatory *per se*, he need not plead or prove actual damages to his reputation; statements that are defamatory *per se* "are thought to be so obviously and materially harmful to the plaintiff that injury to [his] reputation may be presumed." Bryson, 174 Ill. 2d at 87. Illinois recognizes five categories of statements that are defamatory *per se*: (1) those imputing the commission of a criminal offense; (2) those imputing infection with a loathsome communicable disease; (3) those imputing an inability to perform or want of integrity in the discharge of duties of office or employment; (4) those that prejudice a party or impute lack of ability in the party's trade, profession or business; and (5) those imputing adultery or fornication. Bryson, 174 Ill. 2d at 88-89. In our view, the plaintiff's complaint alleges the statements in the Rose column fall into the third and fourth categories of *per se* defamation.

Even if a statement falls into one or more of these categories, however, a statement will not be deemed defamatory *per se* if it is reasonably capable of an "innocent construction." Bryson, 174 Ill. 2d at 90. The so-called "innocent construction rule," as first adopted by the Illinois Supreme Court in John v. Tribune Co., 24 Ill. 2d 437 (1962), provided that words used in an allegedly defamatory statement must be understood given their natural and obvious meaning. John, 24 Ill. 2d at 442. If the words were "capable of being read innocently [the statement] must be so read and declared nonactionable as a matter of law." John, 24 Ill. 2d at 442.

The innocent construction rule was later modified because courts tended to apply the rule inconsistently and often strained to find "unnatural" but possibly innocent meanings of words.

16

See Chapski v. Copley Press, 92 Ill. 2d 344, 350-51 (1982) (providing examples of the inconsistent application of the innocent construction rule). As modified, the rule still requires the statement to be reasonably viewed, to be considered in context with the other words in the statement, and that the implications therefrom be given their natural and obvious meaning. Chapski, 92 Ill. 2d at 351. If the complained-of statement may reasonably be innocently interpreted, it cannot be actionable as *per se* defamation. Chapski, 92 Ill. 2d at 351. The innocent construction rule has been deemed a proper ground for dismissal of a complaint pursuant to section 2-615. See Tuite v. Corbitt, 358 Ill. App. 3d 889, 900 (2005) (affirming the circuit court's order granting a section 2-615 motion to dismiss; libel complaint was nonactionable because the complained-of language was subject to an innocent construction).

When applying the innocent construction rule to a story or column in a newspaper, courts consider the text of the entire article and the headline as one document when considering the context and meaning of the purported article. See Harrison v. Chicago Sun-Times, Inc., 341 Ill. App. 3d 555, 570 (2003), citing American International Hospital v. Chicago Tribune Co., 136 Ill. App. 3d 1019, 1025 (1985), Antonelli v. Field Enterprises, Inc., 115 Ill. App. 3d 432, 435 (1983); and Naked City, Inc. v. Chicago Sun-Times, 77 Ill. App. 3d 188, 190 (1979). The "import of the entire article" must be considered in reaching a determination of reasonable innocent construction. See Owen v. Carr, 134 Ill. App. 3d 855, 860 (1985), aff'd, 113 Ill. 2d 273 (1986). A court should avoid straining "to find an unnatural but possibly innocent meaning for words where the defamatory meaning is far more reasonable." Bryson, 174 Ill. 2d at 94. Instead, we are to interpret the words of the statement as they appear to have been used and according to the

idea they were intended to convey to a reader of reasonable intelligence. <u>Bryson</u>, 174 Ill. 2d at 93. "Whether a statement is reasonably susceptible to an innocent interpretation is a question of law for the court to decide." <u>Bryson</u>, 174 Ill. 2d at 90.

In the instant case, the plaintiff complains that statements in Steve Neal's 2002 Rose column were defamatory. Although Mr. Seith attached a copy of another column authored by Neal in 1996, he alleges that the libel arose from the following language in the 2002 Rose column:

> "Among the other Republicans for whom Rose has worked are former Sen. Charles H. Percy and former Gov. Jim Edgar. In 1978, Rose helped Percy win a tough re-election contest over conservative Democrat Alex Seith. Rose bought ads throughout the state that reprinted the late Sun-Times columnist Mike Royko's column about Seith's ties to the mob-linked 1st Ward." S. Neal, <u>Underdog Wood Goes For Rose</u>, Chicago Sun-Times, February 18, 2002.

Specifically, Mr. Seith asserts that these words accuse him of being in or tied to organized crime. Plaintiff's argument, however, does not consider the statement in the context of the entire column. The article itself was not about Alex Seith, his 1978 race for the United States Senate, his connections to Chicago's First Ward political organization, or that organization's links to organized crime. Instead, from the title to the closing words, the article is about Don Rose, a wily and resourceful political advisor. Neal is describing Rose as a political "miracle worker." The single paragraph where Mr. Seith is mentioned is provided merely as an example of the kinds of political tactics that Rose had employed in the past against the political opponents of his

clients. Another anecdote in the article explains how Rose helped Republican Bernard Carey defeat Democrat Edward Hanrahan in a race for Cook County State's Attorney, where Rose helped emphasize "Hanrahan's involvement in the infamous police raid on the Black Panthers in which Fred Hampton was gunned down in his sleep." S. Neal, Underdog Wood Goes For Rose, Chicago Sun-Times, February 18, 2002. In short, Neal was providing examples of the hardball attack-style politics that Rose readily employed on behalf of his clients. The article did not vouch for the validity of any claims that Rose made about any of these politicians.

Further, the most pejorative parts of the complained-of statements are not aimed directly at Mr. Seith. Instead, the article merely describes Rose's dissemination of Mike Royko's column "about Seith's ties to the mob-linked First Ward." S. Neal, Underdog Wood Goes For Rose, Chicago Sun-Times, February 18, 2002. To the extent the statement could be understood as a comment directly about Mr. Seith, it is not necessarily defamatory. The statement does not directly link Alex Seith to organized crime. Instead, the article imputes those links to the First Ward. This distinguishes the instant case from many of the defamation cases cited by Mr. Seith where the allegations of "mob links" were aimed more directly at the plaintiffs themselves. See Locricchio v. Evening News Association, 438 Mich 84, 130, 476 N.W.2d 112,132 (1991) (noting that the defendants made the "inescapable implication" that the plaintiffs had "numerous financial and social connections with reputed organized crime figures and [those] associations contributed in the financing" of the plaintiffs' business venture); Lynch v. New Jersey Education Association, 161 N.J. 152, 163, 735 A.2d 1129, 1134 (1999) (statements at issue directly accused the plaintiff of being "CONNECTED to the UNDERWORLD" and being a "MOB-

CONNECTED POLITICIAN"); Bufalino v. Associated Press, 692 F.2d 266, 267 (2d Cir. 1982) (plaintiff accused of having "alleged mob ties"). Also, in each of those cases, virtually the entire article or new story in question was about these alleged direct connections to organized crime. In the instant case, in contrast, the statement about Mr. Seith and his links to the First Ward was a brief anecdote intended to demonstrate Rose's political tactics.

Also, the word "ties," which Neal employed to describe Mr. Seith's connections to the First Ward, is rather ambiguous. As used in the instant case, the word "ties" was obviously meant to communicate some sort of connection. A leading dictionary gives various definitions of "tie;" the definition that refers to a "connecting link" reveals that the word "tie" can refer to either "a moral or legal obligation to someone or something typically constituting a restraining power, influence, or duty," or alternatively as a mere "a bond of kinship or affection." Merraim-Webster's Collegiate Dictionary 1233 (10th ed. 1998). These definitions, though not dispositive of the meaning ascribed to the word "ties" as used in the Rose column, give one insight into the various meanings of the word. See Harte v. Chicago Council of Lawyers, 220 Ill. App. 3d 255, 262-63 (1991) (in affirming the circuit court's order granting defendant's section 2-615 motion to dismiss plaintiff's libel claim, the court used a dictionary to consider the meaning of purportedly defamatory words; noting that although these definitions are not necessarily dispositive, they provide persuasive authority when analyzing whether a statement is subject o a reasonable innocent construction). Obviously "ties" can communicate either a close connection, such as an allegiance owed, or a loose connection, such as a social connection or an "affection." The word does not necessarily reflect a coordination of effort or an extreme closeness. The Rose column

certainly does not state that the First Ward sponsored Mr. Seith or that he was part of or the beneficiary of the First Ward's machinery or the First Ward's "links to organized crime." The article simply states that Royko authored and Rose circulated a column stating that Seith had "ties" to that organization and that the organization itself had "links" to organized crime.

In the context of the full article, the complained-of language is not defamatory because it is, in our view, reasonably subject to an innocent construction. The column's passing comment about Mr. Seith's "ties" to the First Ward was merely an anecdote explaining the tactics of Rose, not the professional or personal character of Mr. Seith. Moreover, Steve Neal's 2002 Rose column did not vouch for the truth of Mike Royko's 1978 column; nor did the 2002 column assert the depth or strength of Mr. Seith's "ties" to the First Ward. It is also worth noting that Neal's 2002 Rose column described a column written by Mike Royko and disseminated by a political strategist who is described as having engaged in similar attacks on other candidates. Although the fact that a statement is made as part of a political campaign is not an absolute defense against libel (see Proesel v. Myers Publishing Co., 24 Ill. App. 2d 501, 515 (1960) ("We know of no case holding that a statement otherwise libelous would not be so because it was 'political in nature'")), we note that when construing the meaning and value of a comment, one must consider the context, including the public and social context of rhetoric uttered during a political campaign. See Brennan v. Kadner, 351 Ill. App. 3d 963, 970 (2004) (noting that "literary, public, and social contexts are a major determinant of whether an ordinary reader would view an alleged defamatory statement as constituting fact or opinion"; further noting that " 'where potentially defamatory statements are published in a public debate, a heated labor dispute,

21

or in another setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion' "), citing Moriarty v. Greene, 315 Ill. App. 3d 225, 235 (2000), quoting Gregory v. McDonnell Douglas Corp., 17 Cal. 3d 596, 601, 552 P.2d 425, 428, 131 Cal. Rptr. 641, 644 (1976). It thus stands to reason that in 2002, as today, a reasonable reader would likely be skeptical of statements made or repeated by representatives of one campaign that attack a political opponent. In short, we do not believe that any reasonable person could read Steve Neal's 2002 Rose column and based on that column's passing statement about Alex Seith walk away with a belief that Mr. Seith had close associations with organized crime, either in 1978 or today.

In our view, the instant case is much closer to a series of Illinois cases applying the innocent construction rule to uphold the dismissal of a defamation suit, including Salamone v. Hollinger International, Inc., 347 Ill. App. 3d 837, 840-41 (2004). In that case, this court found that a newspaper article entitled "Mob links hurt Rosemont casino bid" that stated that a person was a "reputed organized crime figure" could be innocently construed. As the Salamone court stated, a reader who considered the headline in the context of the text of the entire article could understand it as characterizing the plaintiff, "not as a mobster, but as a person who is believed to be, possibly erroneously, an organized crime figure." Salamone, 347 Ill. App. 3d at 841. See also Harte v. Chicago Council of Lawyers, 220 Ill. App. 3d 255, 261-62 (1991) (reasonable to construe a statement that plaintiff was "implicated" in a corruption scandal to mean he was

22

involved but not that he was incriminated or engaged in a criminal act); <u>Tuite v. Corbitt</u>, 358 Ill. App. 3d 889, 898 (2005) (statements that a lawyer who took a $1 million retainer "had it all handled" and that a client viewed his acquittal as a "done deal" did not necessarily impute that the plaintiff knowingly received illegally obtained funds for the purpose of doling out bribes and payoffs; in the context of the work, the comments were capable of an innocent construction that the attorney was smart to get his retainer up front, the mafia members were happy because they knew the attorney was a good one, and the evidence won out even in the face of a good lawyer). Similar to the statements in those cases, the complained-of comments in the instant case could be, in context, reasonably understood as having an innocent construction. Because Mr. Seith's libel claim was not actionable, the trial court correctly dismissed his complaint.

### III. Plaintiff's False-Light Invasion of Privacy Claim

The plaintiff also argues that the statements in the Rose Column support a cause of action for false-light invasion of privacy. To sustain this cause of action, a plaintiff must plead: (1) he was placed in a false light before the public by the defendant; (2) the false light would be offensive to a reasonable person; and (3) the defendant acted with actual malice. <u>Salamone</u>, 347 Ill. App. 3d at 844. However, because the plaintiff's unsuccessful defamation *per se* claim is the basis of his false-light claim, plaintiff's false-light invasion of privacy claim fails as well. See <u>Tuite</u>, 358 Ill. App. 3d at 899 ("because the plaintiff's defamation *per se* claim fails, his false light invasion of privacy claim fails as well"), citing <u>Harte</u>, 220 Ill. App. 3d at 263.

### CONCLUSION

For the reasons stated above, we affirm the order of the circuit court of Cook County

1-03-1307

dismissing plaintiff's complaint pursuant to section 2-615 of the Illinois Code of Civil Procedure.

Affirmed.

FITZGERALD-SMITH, P.J., and McNULTY, J., concur.