In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2519

Marc R. Wilkow,

Plaintiff-Appellant,

v.

Forbes, Inc., and Brigid McMenamin,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 3477--Blanche M. Manning, Judge.

Argued January 12, 2001--Decided February 20, 2001

Before Easterbrook, Rovner, and Diane P. Wood, Circuit
Judges.

Easterbrook, Circuit Judge. Forbes Magazine runs a
column on pending litigation of interest to the
business community. The October 5, 1998, issue of
Forbes covered the grant of certiorari in what
was to become Bank of America National Trust &
Savings Ass'n v. 203 North LaSalle Street
Partnership, 526 U.S. 434 (1999), which presented
the question whether the absolute-priority rule
in bankruptcy has a new-value exception. The
absolute-priority rule, codified in 11 U.S.C.
sec.1129(b)(2)(B)(ii), forbids confirmation of a
plan of reorganization over the objection of an
impaired class of creditors unless "the holder of
any claim or interest that is junior to the
claims of such [impaired] class will not receive
or retain under the plan on account of such
junior claim or interest any property." In other
words, creditors may insist on priority of
payment: secured creditors must be paid in full
before unsecured creditors retain any interest,
and unsecured creditors must be paid off before
equity holders retain an interest. But equity
investors frequently argue that this rule may be
bent if they contribute new value as part of the
plan. Although this court had rejected other new-
value arguments, see Kham & Nate's Shoes No. 2 v.
First Bank of Whiting, 908 F.2d 1351, 1359-63
(7th Cir. 1990), in 203 North LaSalle we held
that the equity investors could retain ownership

of a commercial office building, in exchange for
about $6 million in new capital over a five-year
period, even though the principal lender would
fall about $38 million short of full repayment.
In re 203 North LaSalle Street Limited
Partnership, 190 B.R. 567 (Bankr. N.D. Ill.
1995), affirmed, 195 B.R. 692 (N.D. Ill. 1996),
affirmed, 126 F.3d 955 (7th Cir. 1997). This was
the decision on which Forbes published a short
column, seven months before the Supreme Court
held the plan "doomed, . . . without necessarily
exhausting its flaws, by its provision for
vesting equity in the reorganized business in the
Debtor's partners without extending an
opportunity for anyone else either to compete for
that equity or to propose a competing
reorganization plan." 526 U.S. at 454.

  The majority opinion in the Supreme Court
required about 8,000 words to resolve the case--
and without reaching a final decision on the
vitality of the new-value exception (though the
majority's analysis hog-tied the doctrine). The
majority opinion in this court ran about 9,500
words, with 5,200 more in a dissent. A 670-word
article such as the one Forbes published could
not present either the facts of the case or the
subtleties of the law. What the article lacked in
analysis, however, it made up for with colorful
verbs and adjectives. Taking lenders' side,
Forbes complained that "many judges, ever more
sympathetic to debtors, are allowing unscrupulous
business owners to rob creditors." According to
the article, a partnership led by Marc Wilkow
"stiffed" the bank, paying only $55 million on a
$93 million loan while retaining ownership of the
building. The full text of this article appears
in an appendix to this opinion. Its core
paragraph reads:

[B]y the mid-1990s, rents were not keeping up
with costs. When the principal came due in
January 1995, Wilkow and his partners pleaded
poverty. To keep the bank from foreclosing,
LaSalle Partnership filed for bankruptcy.
Appraisals of the property came in at less than
$60 million. In theory the bank was entitled to
the entire amount. It suggested selling the
property to the highest bidder. Determined to
keep the building, LaSalle partners asked the
bankruptcy court instead to accept a plan under
which the bank would likely receive a fraction of
what it was owed while the partners would keep
the building. The bank, not the equity holder,
would take the hit.

Wilkow replied with this libel suit under the
diversity jurisdiction, contending that Forbes
and Brigid McMenamin, the article's author,
defamed him by asserting that he was in poverty

(or, worse, "pleaded poverty" when he was solvent) and had filched the bank's money. According to Wilkow, Forbes should at least have informed its readers that the bank had lent the money without recourse against the partners, so that a downturn in the real estate market, rather than legal machinations, was the principal source of the bank's loss.

The district court dismissed the complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief may be granted. 2000 U.S. Dist. Lexis 6587 (N.D. Ill. May 12, 2000). That was a misstep. A complaint is sufficient whenever the plaintiff could prevail under facts consistent with the complaint's allegations, and defamation is a recognized legal claim. See Cook v. Winfrey, 141 F.3d 322 (7th Cir. 1998); see also Walker v. National Recovery, Inc., 200 F.3d 500 (7th Cir. 1999); Bennett v. Schmidt, 153 F.3d 516 (7th Cir. 1998). The body of this complaint was not self-defeating. Instead the district judge based her decision on the text of the article. But when "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(b). If Wilkow were arguing that he wanted the additional procedures that precede summary judgment under Rule 56, we would be obliged to remand. Yet Wilkow does not ask for more process, so we treat the case as if the district court had granted summary judgment.

In the district court the parties wrangled about choice of law. Forbes is based in New York, and Wilkow's business has its headquarters in Chicago. The district judge split the difference, ruling that Illinois law supplies the claim for relief but that New York law supplies an absolute privilege for "the publication of a fair and true report of any judicial proceeding". McKinney's New York Civil Rights Law sec.74. According to the judge, McMenamin's story is privileged under New York law as a report of proceedings in 203 North LaSalle Street. The judge added, for good measure, that the article is protected by the first amendment because the forceful characterizations to which Wilkow objects are opinions rather than facts. See Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990); Gertz v. Robert Welch, Inc., 418 U.S. 323, 339-40 (1974); Stevens v. Tillman, 855 F.2d 394, 398-400 (7th Cir. 1988). Forbes did not misstate any of the details of the situation, and neither Illinois nor New York requires a reporter to include all facts (such as the nonrecourse nature

of the loan) that put the subject in the best light.

We don't think it necessary to consider either constitutional limits on liability for defamation or privileges under New York law, because this article is not defamatory under Illinois law in the first place. (The parties do not contest the district court's conclusion that Illinois law governs the claim and New York law the defense of privilege.) In Illinois, a "statement of fact is not shielded from an action for defamation by being prefaced with the words 'in my opinion,' but if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1227 (7th Cir. 1993). See also Sullivan v. Conway, 157 F.3d 1092 (7th Cir. 1998) (Illinois law); Bryson v. News America Publications, Inc., 174 Ill. 2d 77, 100, 672 N.E.2d 1207, 1220 (1996); Stevens, 855 F.2d at 400 ("we do not think [that under Illinois law] the statements characterized as 'opinions' are actionable independent of the factual propositions they imply").

Characterizations such as "stiffing" and "rob" convey McMenamin's objection to the new-value exception. She expostulates against judicial willingness to allow debtors to retain interests in exchange for new value, not particularly against debtors' seizing whatever opportunities the law allows. Nothing in the article implies that Wilkow did (or even proposed) anything illegal; Forbes informed the reader that the district court and this court approved Wilkow's proposed plan of reorganization. Every detail in the article (other than the quotation in the final paragraph) comes from public documents; the article does not suggest that McMenamin knows extra information implying that Wilkow pulled the wool over judges' eyes or engaged in other misconduct. Colloquialisms such as "pleaded poverty" do not imply that Wilkow was destitute and failing to pay his personal creditors, an allegation that would have been defamatory. Read in context, the phrase conveys the idea that the partnership could not repay the loan out of rents received from the building's tenants. After all, inability to pay one's debts as they come due is an ordinary reason for bankruptcy, and 203 North LaSalle Street Partnership did file a petition in bankruptcy. Filing a bankruptcy petition is one way of "pleading poverty."

Although the article drips with disapproval of Wilkow's (and the judges') conduct, an author's opinion about business ethics isn't defamatory

under Illinois law, as Haynes and Bryson explain. Informing the reader about the nonrecourse nature of the loan might have made Wilkow look better, but it would not have drawn the article's sting: that the partners got to keep the property even though the bank lost $38 million. The original deal's fundamental structure was that the partnership would repay the loan from rental income, and that if revenue was insufficient the bank could choose to foreclose (cutting its loss and reinvesting at the market rate elsewhere), to renegotiate a new interest rate with the partners, or to forebear in the hope that the market would improve and the full debt could yet be paid. These options collectively would be worth more than the market value of the building on the date of default. Yet the partners refused to honor these promises to the bank. They persuaded judges to eliminate the bank's rights to foreclose, to renegotiate, or to forebear and retain the full security interest. The plan of reorganization stripped down the security interest, prevented the bank from foreclosing, and required it to finance the partnership's operations for the next decade, at a rate of interest below what the bank would have charged in light of the newly revealed riskiness of the loan. If the real estate market fell further during that time, so that the partnership could not repay even the reduced debt, then the bank was going to lose still more money. The present value of the promises made to the bank in the plan of reorganization therefore was less than the appraised value of the building. But the partners stood to make a great deal of money if the market turned up again (as it did), for they had shucked $38 million in secured debt while retaining most appreciation in the property's value. Whether that was a sound use of bankruptcy reorganization, independent of the plan's new-value aspects, is open to question. See National Bankruptcy Commission, Final Report 661-706k (Oct. 20, 1997).

A reporter is entitled to state her view that an ethical entrepreneur should have offered the lender a better bargain, such as allowing the bank to foreclose and take its $55 million with certainty, avoiding the additional risk that this plan fastened on the lender. Foreclosure would have had serious consequences for the partners, who would have lost about $20 million in recaptured tax benefits. These potential losses created room for negotiation. Armed with the new-value exception, however, the partners were able to retain the tax benefits, sharing none with the bank in exchange for its approval of a restructuring, while depriving the bank of a security interest that would have been valuable when the market recovered. Although a reader

might arch an eyebrow at Wilkow's strategy, an allegation of greed is not defamatory; sedulous pursuit of self-interest is the engine that propels a market economy. Capitalism certainly does not depend on sharp practices, but neither is an allegation of sharp dealing anything more than an uncharitable opinion. Illinois does not attach damages to name-calling. See Stevens, 855 F.2d at 400-02 (collecting cases, including examples such as "sleazy" and "rip-off"). Wilkow's current and potential partners would have read this article as an endorsement of Wilkow's strategy; they want to invest with a general partner who drives the hardest possible bargain with lenders. By observing that Wilkow used every opening the courts allowed, Forbes may well have improved his standing with investors looking for real estate tax shelters (though surely it did not help his standing with lenders). No matter the net effect of the article, however, it was not defamatory under Illinois law, so the judgment of the district court is

affirmed.


Appendix

Have the courts gone too far in protecting debtors against creditors? In this case it sure looks like it.

Stiffing the creditor

By Brigid McMenamin

   IT HAPPENS EVERY DAY:  Business seeks refuge in bankruptcy; owner and creditors make a deal-- leaving owner in charge.

   Presumably the creditors are satisfied that they got the best possible deal under the circumstances. But what if the owner tries to shaft them by offering only pennies on the dollar? These days, often as not, courts are siding with the bankrupt owners and forcing creditors to accept almost whatever deal the bankrupt party offers them.

   In short, many judges, ever more sympathetic to debtors, are allowing unscrupulous business owners to rob creditors.

   Unless a creditor is prepared to spend years battling it out in court, he usually caves in. Forget the old rule that in bankruptcy creditors enjoy "absolute priority" over debtors.

The U.S. Supreme Court will soon test the limits of this leniency. It has agreed to review a case in which the Bank of America National Trust & Savings Association claims it was stiffed by a real estate partnership led by Marc Wilkow of M&J Wilkow, Ltd., a Chicago-based manager of strip malls and offices.

The bank is asking the Court to nix a bankruptcy plan under which it might receive as little as $55 million for its $93 million lien against a Chicago office building. Under Wilkow's plan the bank must give up as much as 40% of its claim while Wilkow and his partners get to keep the building.

A lot rides on an eventual Supreme Court decision. That's why eight outsiders have filed friend-of-the-court briefs, including the American Bankers Association, the American Council of Life Insurance, the American College of Real Estate Lawyers and the Solicitor General.

The whole mess started in 1987 when Bank of America began lending 203 N. LaSalle Street Partnership $93 million to build a sleek building in Chicago with a 15-floor, 547,000-square-foot office space. The place was soon humming, 98% leased to everything from Coopers & Lybrand to the American Civil Liberties Union.

But by the mid-1990s, rents were not keeping up with costs. When the principal came due in January 1995, Wilkow and his partners pleaded poverty. To keep the bank from foreclosing, LaSalle Partnership filed for bankruptcy. Appraisals of the property came in at less than $60 million. In theory the bank was entitled to the entire amount. It suggested selling the property to the highest bidder. Determined to keep the building, LaSalle partners asked the bankruptcy court instead to accept a plan under which the bank would likely receive a fraction of what it was owed while the partners would keep the building. The bank, not the equity holder, would take the hit.

Yet federal judge Paul Plunkett blessed LaSalle's plan. Bank of America will get as little as $55 million plus interest--and even that in monthly payments over seven to ten years.

What happened to the old "absolute priority rule"? To get around that, the partners used a controversial "new value" concept in which the owners agree to kick in fresh capital in return for equity.

To validate the concept, the owners proposed to put in $6.1 million in fresh capital, over five

years.

   Nice deal--for the debtor. The bank takes an up-to-$38 million haircut, and the owner throws in just $4.1 million in present value.

   In September 1997 the federal appeals court that heard the case deferred to the lower court's decision. So the bank petitioned the Supreme Court to step in. On May 4 it agreed.

   Bank of America's argument has been boosted by a February ruling from a federal appeals court in New York that found in favor of the creditors in a similar situation. With two such recent conflicting rulings and so much at stake, arguments before the Supreme Court will be heard on Nov. 2.

   Realizing the Court could rule against the partnership, Wilkow says he is willing to sweeten his offer. "The time to talk settlement is when there's a cloud of uncertainty over everyone's head," he explains.

[McMenamin's article was accompanied by a photograph of the 203 North LaSalle Street building captioned "Chicago's 203 North LaSalle Street, Stiffing the bank with court approval."]