In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-2800

GIANT SCREEN SPORTS, doing business as,
GIANT SCREEN FILMS LLC, and GIANT SCREEN
FILMS VIKINGS LLC,

*Plaintiffs-Appellants*,

*v.*

CANADIAN IMPERIAL BANK OF COMMERCE,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 7184—**Samuel Der-Yeghiayan**, *Judge.*

ARGUED SEPTEMBER 9, 2008—DECIDED JANUARY 20, 2009

Before BAUER, CUDAHY, and WOOD, *Circuit Judges*.

BAUER, *Circuit Judge*. This is an appeal from a grant
of summary judgment in favor of the defendant in a
suit claiming defamation *per se* in written statements
made by the defendant concerning business dealings of
the plaintiff.

In October 2001, Giant Screen Sports (doing business as Giant Screen Films LLC) and Sky High entered into an agreement which called for Giant Screen Sports to distribute two films produced by Sky High entitled "Adrenaline Rush" and "Ultimate Gs." A year later, Sky High entered into a similar agreement for a subsidiary of Giant Screen Sports, Giant Screen Films Vikings LLC (collectively "Giant Screen"), to distribute Sky High's film entitled "Vikings: Journey to New Worlds." As part of this Vikings agreement (Distribution Agreement), Giant Screen agreed to pay Sky High a total of $3 million during the three-year period following the distribution of the Vikings film.

To finance the production of "Vikings," Sky High negotiated a credit agreement with Canadian Imperial Bank of Commerce (CIBC). As security for the loan, Sky High was required to assign CIBC the $3 million expected from Giant Screen under the Distribution Agreement. CIBC also required Sky High to obtain insurance from Export Development Canada (EDC), covering the payments due if Giant Screen defaulted. EDC would not insure the payments under this agreement. EDC would only issue the policy if several provisions were altered to reflect a new Distribution Agreement (Falsified Distribution Agreement), particularly to require that Giant Screen pay the $3 million in $500,000 installments and Giant Screen guarantee Sky High's financial obligations.

EDC would issue the insurance policy only if it approved the Credit Agreement, and the new provisions reflected in the Falsified Distribution Agreement, between

CIBC and Sky High. The insurance policy would not cover non-payments if Giant Screen's non-payment was the result of fraud on the part of Sky High. Giant Screen's signature was required on the Falsified Distribution Agreement since it was becoming a guarantor and its contractual obligations were being altered; EDC would not issue its policy and CIBC would not fund the loan to Sky High if Giant Screen's signature was not present. No party, including CIBC, ever contacted Giant Screen regarding the proposed modifications. In a correspondence to CIBC and Sky High, EDC acknowledged that the modifications would probably be difficult for Giant Screen to accept, since they accelerated the payments due.

On November 29, 2002, Sky High sent CIBC a contract, representing the new changes required to issue the loan, and seemingly bearing the appropriate signatures of Sky High and Giant Screen. Giant Screen maintains that it was unaware of the changes reflected in the Falsified Distribution Agreement and that its signature on this agreement was forged to obtain the loan.

Also, as part of the Credit Agreement, which incorporated the Falsified Distribution Agreement, CIBC required that Giant Screen make the $3 million in installment payments directly to CIBC under a Notice of Security, Direction of Payment and Distributor Acceptance (Notice of Security). Sky High sent CIBC a signed copy of the Notice of Security, again bearing the appropriate signatures of Sky High and Giant Screen. Giant Screen maintains that it was unaware of the Notice of Security and that its signature on this document was also forged.

On October 6, 2004, CIBC sent a letter to Giant Screen, together with a copy of the Notice of Security, that the payments under the Notice of Security should thereafter be paid to CIBC. Giant Screen maintains that this was the first time it became aware of the Notice of Security.

After the letters were received, Giant Screen responded that it was not familiar with the Notice of Security and that CIBC should address the issue with Sky High. After several later communications denying familiarity with the Notice of Security, Giant Screen stated to CIBC that in Giant Screen's belief, it had no obligation to CIBC since it was not a party to that agreement.

On November 12, 2004, Giant Screen informed CIBC that the signature on the Notice of Security was not the signature of its president, Donald Kempf. CIBC acknowledged that it had not received any documents directly from Giant Screen, but rather through Sky High. CIBC expressed concerns regarding Sky High's offer to obtain Giant Screen's signature, which CIBC initially expected to gather directly.

On November 15, 2004, CIBC sent Giant Screen copies of the Falsified Distribution Agreement, the Notice of Security, and various pledgeholder agreements to determine whether all of Donald Kempf's signatures were forgeries. The following day, Giant Screen informed CIBC that it would cooperate with the forgery investigation, but needed the protection of legal process before doing so. Although Giant Screen did not answer as to whether the signatures were forgeries, Giant Screen did state that CIBC would not like the answers about the signatures' authenticity.

On November 24, 2004, CIBC sent Sky High a letter requesting an explanation of Giant Screen's forged signature on the Notice of Security. Sky High did not respond. CIBC declared Sky High in default and sued under the Credit Agreement. In an affidavit, CIBC stated that it feared the Notice of Security was false and the disbursement of the loan provided by the Credit Agreement was based on false representations.

In April 2005, CIBC settled its claim with Sky High, providing that Sky High would cooperate with CIBC in requiring Giant Screen to abide by the Notice of Security. Giant Screen and EDC received a letter from CIBC indicating that the matter was settled and that the Credit Agreement between Sky High and CIBC had been reinstated.

On June 7, 2005, CIBC filed an insurance claim with EDC. The claim stated that CIBC had sustained a loss as a result of Giant Screen's failure or refusal to pay the first installment of $500,000 under the Falsified Distribution Agreement.

EDC inquired into the insurance claim by asking CIBC about Giant Screen's default and whether there were any disputes with Sky High that would impede payment of the first installment. CIBC stated that, to its knowledge, Giant Screen was still in default and that it was unaware of any disputes that would impede payment and did not know of any reason why Giant Screen had not paid.

Giant Screen then filed a diversity action against Sky High and its president Samson, and later added CIBC as a defendant. Giant Screen asserted that it was *per se* defamed by CIBC in CIBC's letters to EDC about Giant

Screen's lack of payment. CIBC filed cross-claims against Sky High and counterclaims against Giant Screen. The district court granted in part and denied in part both Giant Screen's and CIBC's motions for sanctions against Sky High for the forgery; granted summary judgment in favor of both Giant Screen and CIBC against Sky High; and granted summary judgment in favor of Giant Screen on CIBC's counterclaims. The district court granted summary judgment in favor of CIBC on Giant Screen's defamation *per se* claim, finding that the communications were not defamatory since they were subjective opinions, subject to innocent constructions, and made for a legitimate business purpose. Giant Screen filed this timely appeal only as to its defamation *per se* claim.

## DISCUSSION

Giant Screen claims that the statements made about its contractual failures to pay a legal debt and its "default" status were so serious that its reputational injury may be presumed as defamation *per se*. Giant Screen also argues that CIBC abused its qualified privilege to make such statements since CIBC either knew of the forgery or displayed a reckless disregard for the truth or falsity of the statements before filing the insurance claim. We review *de novo* the district court's decision to grant summary judgment, construing all the facts and inferences in favor of Giant Screen. *See Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 726 (7th Cir. 2004).

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "The initial burden is on the moving party . . . to demonstrate that there is no material question of fact with respect to an essential element of the non-moving party's case." *Cody v. Harris*, 409 F.3d 853, 860 (7th Cir. 2005). If the moving party meets this burden, the non-moving party must submit evidence that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 694 (7th Cir. 2006). The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Id*. We apply the substantive law of Illinois, the state in which this diversity case was filed, to each of Giant Screen's claims. *See Global Relief Found., Inc. v. New York Times Co.*, 390 F.3d 973, 981 (7th Cir. 2004).

### A.  Defamation *Per Se*

Giant Screen claims that CIBC's statements made to EDC imputed an inability to perform or a want of integrity; that the statements, taken as a whole, express a failure of Giant Screen to uphold contractual obligations, and that these statements prejudice its reputation in the industry. We agree.

Defamation actions provide redress for false statements of fact that harm a plaintiff's reputation. *Brennan*

*v. Kadner*, 814 N.E.2d 951, 956 (Ill. App. Ct. 2004). A statement is defamatory if its publication "tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with [the plaintiff]." *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 206 (Ill. 1992). To prove a defamation claim, the evidence must show that a defendant made a false statement concerning the plaintiff, that there was an unprivileged publication of the defamatory statement to a third party by the defendant, and that the plaintiff suffered damages as a result. *Seith v. Chicago Sun-Times, Inc.*, 861 N.E.2d 1117, 1126 (Ill. App. Ct. 2007). Illinois recognizes two types of defamation: defamation *per se* and defamation *per quod*. *Knafel v. Chicago Sun-Times, Inc.*, 413 F.3d 637, 639 (7th Cir. 2005). This case is based on a claim of defamation *per se*.

Some statements are considered defamatory *per se* because they are "so obviously and materially harmful" to a plaintiff that his injury may be presumed and he does not need to prove actual damages to recover, as the defamatory character is apparent on its face. *Tuite v. Corbitt*, 866 N.E.2d 114, 121 (Ill. 2006). Illinois recognizes five categories of statements which are considered action-able *per se*; two are pertinent to this case: (1) those imputing an inability to perform or want of integrity in the discharge of one's duties of office or employment; and (2) those that prejudice a party, or impute lack of ability, in his or her trade, profession or business. *Bryson v. News America Publications, Inc.*, 672 N.E.2d 1207, 1214 (Ill. 1996).

Although a statement may fit into one of these categories, this fact, standing alone, "has no bearing on

whether the alleged defamatory statement is actionable," because certain factors may render defamatory statements non-actionable as a matter of law. *Hopewell v. Vitullo*, 701 N.E.2d 99, 102 (Ill. App. Ct. 1998). For example, as CIBC argues, if a defendant's statements are reasonably capable of an innocent, nondefamatory construction, a plaintiff cannot maintain action for defamation *per se*. *Bryson*, 672 N.E.2d at 1215. The innocent construction rule "requires courts to consider a written or oral statement in context, giving the words, and their implications, their natural and obvious meaning." *Id*. If the "complained-of statement may reasonably be innocently interpreted, it cannot be actionable *per se*." *Harrison v. Chicago Sun-Times, Inc.*, 793 N.E.2d 760, 772 (Ill. App. Ct. 2003). Illinois courts emphasize that the interpretation must be *reasonable*. *Bryson*, 672 N.E.2d at 1215. Illinois courts and our court have held that whether a statement is reasonably capable of an innocent construction is a question of law for the court to decide. *See Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003); *See also Anderson v. Vanden Dorpel*, 667 N.E.2d 1296, 1302 (Ill. 1996). The First Amendment also affords protection from liability to a speaker expressing an opinion that does not misstate actual facts. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990); *see also Moriarty v. Greene*, 732 N.E.2d 730, 739 (Ill. App. Ct. 2000).

There are three disputed statements in this case: (1) that Giant Screen's failure or refusal to pay resulted in CIBC's loss; (2) that Giant Screen was still in default of its payment obligations; and (3) that CIBC was unaware of any Sky High disputes that would impede Giant Screen's

payment. CIBC principally argues that the district court was correct in finding that these statements are not *per se* defamatory because they are capable of reasonable, innocent constructions.

In considering allegedly defamatory statements under the innocent construction rule, courts must interpret the words "as they appeared to have been used and according to the idea they intended to convey to the reasonable reader." *Bryson*, 672 N.E.2d at 1217. The rule "does not require courts to strain to find an unnatural innocent meaning for a statement when a defamatory meaning is far more reasonable." *Tuite*, 866 N.E.2d at 123 (quoting *Bryson*, 672 N.E.2d at 1217). It also does not require courts "to espouse a naïveté unwarranted under the circumstances." *Id*. Thus, "when a defamatory meaning was clearly intended and conveyed, [Illinois courts] will not strain to interpret allegedly defamatory words in their mildest and most inoffensive sense in order to hold them nonlibellous under the innocent construction rule." *Bryson*, 672 N.E.2d at 1217.

Our inquiry, then, is whether there is a reasonable, innocent construction of CIBC's words: an interpretation other than that of Giant Screen's purposeful delinquency in its financial obligations. In making this determination, the context of the statements is critical in determining their meaning. *See Bryson*, 672 N.E.2d at 1215.

CIBC argues that the three statements do not imply that Giant Screen deliberately disregarded its obligation to pay a lawful debt for an improper reason. Rather, the refusal or failure to pay could have resulted from a mis-

take, a breach by Sky High, a good faith dispute over liability, or other innocent constructions, to support summary judgment in CIBC's favor. *See Muzikowski v. Paramount Pictures*, 477 F.3d 899, 904 (7th Cir. 2007) ("If a statement is capable of two reasonable constrictions, one defamatory and one innocent, the innocent one will prevail."). We disagree. There is no *reasonable* construction of the statements other than that Giant Screen was unable to perform or willfully refused to meet its financial obligations.

CIBC disparaged Giant Screen's ability and integrity as a business by telling EDC that, in essence, Giant Screen's contractual word to meet an obligation is meaningless. The natural and obvious response of anyone contemplating entering an agreement with Giant Screen, upon being told that Giant Screen had either refused or failed to pay a legal obligation, is to not transact with Giant Screen, but take his business elsewhere. *See Action Repair v. American Broadcasting Companies*, 776 F.2d 143, 148 (7th Cir. 1985). More importantly, CIBC's second letter expressly stated that Giant Screen was "still in default." Such an express statement about Giant Screen's lack of financial integrity is not intended to put EDC on notice of a future claim, but to inform EDC that Giant Screen had purposely disregarded payments it was legally obligated to make. With such an intentional breach, CIBC argued it was entitled to the insurance proceeds.

It was the district court's job to decide whether, in light of the summary judgment record, the statements made to EDC could reasonably, without undue strain, be inter-

preted innocently. However, the district court's decision puts an undue strain on the meaning behind CIBC's statements. CIBC intended to convey, and indeed expressly stated, that Giant Screen was in default of a payment legally due. CIBC reinforced this negative portrayal of Giant Screen by stating that Giant Screen was "still in default," suggesting that Giant Screen couldn't or wouldn't make payments that were due. Moreover, CIBC communicated to EDC that it knew of no dispute with Sky High that would impede Giant Screen's payment. This statement strengthened CIBC's message that there was no justification for Giant Screen's non-payment, implying only that Giant Screen purposely failed or willfully refused to uphold its end of the bargain.

Illinois law rejects attempts to imagine innocent explanations of plainly defamatory statements. *Tuite*, 866 N.E.2d at 123. Upon reading these statements, EDC's reaction would not be that "failure or refusal to pay" or "still being in default" were innocent statements. *See Action Repair*, 776 F.2d at 148. "Default," when used to describe the status of a transacting business, is the willful refusal to pay an obligation. The word alone triggers notions of collection and bankruptcy proceedings. Although the district court decided that the letters' purpose was to put EDC on notice of a potential claim, we conclude that both letters were actually a claim on the insurance company for the respective proceeds. In addition to stating that Giant Screen breached its contractual duty, the August 26, 2005 letter concludes with CIBC advising EDC that any potential investigation into the claim should not preclude "prompt payment" of the insurance proceeds. CIBC's intent was

to collect the proceeds under the insurance policy, and to do so, CIBC expressly stated that Giant Screen purposely welshed on its financial obligations. To the reasonable reader, the statements, taken as a whole, convey the untrue imputation that Giant Screen is an intentionally dishonest business entity, which purposely disregards its financial contracts.

The district court also decided that the statements cannot be reasonably interpreted as actual facts, but only as subjective opinions, thereby protecting the statements as non-actionable opinions. Statements of opinion, although defamatory, do not give rise to a defamation claim. *See Bryson*, 672 N.E.2d at 1220 (quoting *Milkovich*, 497 U.S. at 20) (a defamatory statement is protected under the First Amendment and rendered non-actionable only if the remark "cannot be reasonably interpreted as stating actual facts."). If it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable. *Wilkow v. Forbes*, 241 F.3d 552, 555 (7th Cir. 2001). To be actionable, the allegedly defamatory statement must contain an objectively verifiable factual assertion. *See Lifton v. Bd. of Educ. of the City of Chicago*, 416 F.3d 571, 579 (7th Cir. 2005). Although "in one sense all opinions imply facts, the question of whether a statement of opinion is actionable as defamation is one of degree; the vaguer and more generalized the opinion, the more likely the opinion is non-actionable as a matter of law." *Wynne v. Loyola Univ.*, 741 N.E.2d 669, 676 (Ill. App. Ct. 2000).

The statements at issue are not non-actionable statements of opinion; they contain objectively verifiable factual assertions. A speaker's remarks cannot be divorced from the context in which they occur. Although the circumstances under which a remark was made may "negate the impression that the statement had factual content," the statements here were made to an insurance company to collect proceeds, giving the greatest impression that each statement had factual content and was not merely a generalized, vague statement. *Hopewell*, 701 N.E.2d at 103. CIBC could not collect, and certainly EDC would not pay, unless it had been factually stated, not subjectively opined, that Giant Screen was in default.

Although the district court decided that the statements were mere suppositions, characterizations such as "failure or refusal" to pay and "still in default" convey that Giant Screen, as a matter of fact, intentionally did not pay what it was legally obligated to. The reasonable reader would understand CIBC to be informing him of events that already have occurred, namely that Giant Screen inexcusably did not pay what it should have. Expressing that a party delinquently failed to meet a contractual obligation, particularly that it "did not pay" or "refused to pay" or remains "in default," is an objectively factual assertion, clearly capable of being verified as a statement of fact, and does not fall within the protective ambit of the Constitution.

Furthermore, CIBC's *per se* defamatory statements are not saved from being actionable as non-actionable opinion by the prefatory term, "[t]o CIBC's knowledge,"

when stating that Giant Screen remained in default. Prefatory language does not control whether the statement is defamatory. *See Milkovich,* 497 U.S. at 17-21; *see also Wilkow*, 241 F.3d at 555. This court has held that statements of fact are not shielded from an action for defamation even if prefaced with the words "in my opinion." *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1227 (7th Cir. 1993). As previously discussed, CIBC's statements are not expressing a subjective view.

Again, context is key, and here, CIBC was making a claim for insurance proceeds by factually stating that Giant Screen breached its obligation. To hold that CIBC was making a claim for insurance proceeds by expressing its subjective opinion is unreasonable.

As noted, courts will not strain to find an innocent meaning for words when a defamatory construction is far more reasonable. *Bryson*, 672 N.E.2d at 1217. CIBC's statements about Giant Screen are not reasonably susceptible to an innocent construction. They are not non-actionable statements of opinion; they are so harmful to Giant Screen that they constitute defamation *per se*. Summary judgment on Giant Screen's defamation *per se* claim was improperly granted.

### B. Qualified Privilege

The district court also decided that there was a qualified privilege in CIBC's communication to EDC. Although Giant Screen does not question the existence of such a privilege, Giant Screen argues and we conclude that

there are triable issues of material fact as to whether the privilege had been abused.

Even if a qualified privilege exists, the communication can still be defamatory and actionable if the privilege has been abused. "In general terms, overcoming the qualified privilege requires a showing that the defendant either intentionally published the material while knowing the matter was false, or displayed a reckless disregard as to the matter's falseness." *Smock v. Nolan*, 361 F.3d 367, 372 (7th Cir. 2004) (citing *Kuwik v. Starmark Star Mktg. and Admin., Inc.*, 619 N.E.2d 129, 133 (Ill. 1993)). To prove such abuse, a plaintiff must show "a direct intention to injure another, or a reckless disregard of [the defamed party's] rights and of the consequences that may result to him." *Kuwik,* 619 N.E.2d at 135. Importantly, a defendant acts with reckless disregard when it makes a statement "despite a high degree of awareness of probable falsity or entertaining serious doubts as to its truth." *Id.* at 133 (citation omitted). Reckless disregard of a plaintiff's rights can also include the failure to properly investigate the truth of the matter**.** *Id*. at 136*.* Although whether a qualified privilege exists is a question of law for the court, the issue of whether the privilege was abused is a question of fact for the jury. *Id.* at 133.

The question of whether CIBC abused its privilege in making any of the defamatory statements involves only one factual dispute: whether CIBC knew of the forgery or had reason to know of the forgery when it made its insurance claim. We conclude that genuine issues of material fact exist as to whether CIBC knew of or had reason to

suspect the forgery, which indicate that CIBC's behavior in sending the letters to EDC may have been in reckless disregard of Giant Screen's rights.

Although CIBC acknowledged the Notice of Security's forgery, CIBC argues that it neither knew nor should have known that Giant Screen's signature on the Falsified Distribution Agreement was forged. Because of this, CIBC argues that a reasonable jury could not conclude that CIBC directly intended to injure Giant Screen or recklessly disregarded Giant Screen's rights when making its insurance claim. Specifically, CIBC asserts that in November 2004, it sent Giant Screen a copy of the Falsified Distribution Agreement to examine the signature's authenticity. In response, Giant Screen did not tell CIBC that the document was forged, leading to CIBC's belief that nothing was wrong with the document. Also, CIBC argues that it was unaware of any dispute involving Sky High, since it had settled its suit with Sky High prior to making its claim with EDC. With these undisputed facts, CIBC argues it was entitled to summary judgment since no jury could reasonably conclude that it had a direct intention to injure Giant Screen or that it recklessly disregarded Giant Screen's rights.

We are not satisfied, especially in viewing the record in Giant Screen's favor, that nothing in this record could have justified a jury finding that the privilege had been abused. There are disputes of material fact as to whether CIBC made the statements to EDC knowing either they were false or highly likely to be false. When Sky High defaulted on the CIBC loan, CIBC sought payment from

Giant Screen, attaching the Notice of Security to the payment request. In response, Giant Screen repeatedly denied familiarity with the document. On November 12, 2004, Giant Screen expressly stated to CIBC that it had not signed the Notice of Security. At this point, CIBC would have had reason to suspect that Giant Screen's signatures might not have been authentic.

CIBC argues that the Notice of Security's forgery does not raise a genuine issue of material fact regarding the Falsified Distribution Agreement. We disagree; the Falsified Distribution Agreement encompassed the Notice of Security and neither of the forged documents could be viewed in isolation. In the first defamatory letter to EDC, CIBC stated that it suffered a loss as a result of Giant Screen's failure or refusal to pay under the Distribution Agreement, "as defined by the policy." The policy defines the agreement "as being amended by the Notice" of Security. EDC therefore issued the policy reflecting both the Notice of Security and the Falsified Distribution Agreement. Moreover, Section Two of the Notice of Security obligates Giant Screen to make the guaranteed payments due under the Falsified Distribution Agreement directly to CIBC. Thus, the Falsified Distribution Agreement incorporated the Notice of Security. We reject CIBC's argument that the documents are independent of each other and that knowledge of a forgery on the Notice of Security does not give rise to knowledge, or reason to know, of forgery on the Falsified Distribution Agreement. If one was acknowledged as forged, there are genuine issues of material fact as to whether the other's authenticity should at least have been in doubt.

Importantly, three days after Giant Screen stated that the Notice of Security had been forged, CIBC acknowledged the forgery, and inquired whether other documents, such as the Falsified Distribution Agreement, had also been forged. A jury could conclude that CIBC knew or, at a minimum, had reason to know that the Falsified Distribution Agreement had been forged. By asking whether the Falsified Distribution Agreement had been forged, there are genuine issues present as to whether CIBC entertained serious doubts as to the authenticity of its signature. The request alone establishes factual disputes regarding the suspicion raised as to the signature's genuineness. Further, Giant Screen informed CIBC that it would not "like the answers," cementing triable issues of fact concerning whether Giant Screen provided notice to CIBC that the document had been forged.

Forgeries of Giant Screen's signature prompted CIBC to send a letter to Sky High requesting an explanation for the Notice of Security's lack of authenticity. When Sky High failed to respond, CIBC filed suit against Sky High, stating in an affidavit that it "feared" the Notice of Security was false and based on false representations. CIBC then filed its insurance claim with EDC. A reasonable jury could conclude that CIBC "feared" the forgery because, as CIBC's internal communications reflect, a forgery would preclude receipt of the insurance proceeds. The factual disputes, taken favorably on Giant Screen's behalf, suggest that CIBC's failure to investigate the truth prior to its claim may have been reckless.

All of these events lead to triable issues of material fact as to whether CIBC knew or had reason to know of the

Falsified Distribution Agreement's forged signature. A triable issue of fact exists as to whether CIBC recklessly disregarded Giant Screen's rights by failing to properly investigate the truth behind the signature before making the insurance claim.

## CONCLUSION

The district court held that CIBC's statements to EDC were not *per se* defamatory and that CIBC's qualified privilege rendered them non-actionable. We conclude, however, that the statements amounted to defamation *per se* and genuine issues of material fact exist as to CIBC's abuse of its privilege. Therefore, we REVERSE and REMAND for further proceedings. Rule 36 is to apply.

CUDAHY, *Circuit Judge*, dissenting. After Giant Screen and Sky High executed an agreement to co-produce an IMAX film about Vikings, Sky High sought and obtained additional financing by perpetrating a fraud on the defendant CIBC: it forged signatures on a series of documents through which Giant Screen appeared to guarantee CIBC's loan to Sky High. Not surprisingly given these rather inauspicious beginnings, things did not end well. Sky High failed to deliver the film on time, CIBC sent Giant

Screen a letter demanding repayment and Giant Screen disclaimed knowledge of the fraudulent documents by means of which Giant Screen appeared to have guaranteed the loan. CIBC made some preliminary inquiries into Giant Screen's allegations of fraud, but gave up when Giant Screen said it would answer CIBC's questions only if ordered to do so by a court. Without inquiring further, CIBC made a series of statements to its insurer that lie at the center of this dispute. Most pertinently, it stated that Giant Screen was "still in default of its payment obligations."

As I read this statement, and the other statements that are at issue here, I find myself incapable of the sort of indignation that seems to animate the majority opinion. According to the majority, CIBC's statement suggests that "Giant Screen's contractual word to meet an obligation is meaningless" (Maj. Op. at 11), and "triggers notions of collection and bankruptcy proceedings." (Maj. Op. at 12.) To my ear, the statement does no such thing. CIBC has not said that Giant Screen is incapable of paying; it has not even stated that Giant Screen lacked an *excuse* for nonpayment. It has said only that Giant Screen simply has not paid, and that payment was due. What, then, has led my colleagues to conclude that this is defamatory?

It seems safe to say that my colleagues have not based their decision on specific Illinois precedent. Indeed, given that we are sitting in diversity, one can't help but be struck by the majority's indifference to the fact that Illinois courts have stated that "[a]llegations of out-

standing debts and the failure of a business venture are neither necessarily injurious to a person's business reputation nor indicative of a lack of integrity in business dealings." *Makis v. Area Publ'ns Corp.*, 395 N.E.2d 1185, 1189 (Ill. App. Ct. 1st Dist. 1979). It appears to be widely accepted, both in Illinois and elsewhere, that the mere statement that someone has failed to perform under an agreement does not, without more, implicate one's ability, business integrity or solvency. *See, e.g., Springer v. Harwig*, 418 N.E.2d 870, 872 (Ill. App. Ct. 1st Dist. 1981) (lawsuit charging a person with failure to perform under an agreement "does not, in itself, charge him with lack of ability or integrity in his business."); *Am. Needle & Novelty, Inc. v. Drew Pearson Mktg., Inc.*, 820 F. Supp. 1072, 1075-76 (N.D. Ill. 1993) (statement that plaintiff has knowingly breached an agreement and is delinquent in payments "while discourteous . . . do[es] not, in obviously and naturally harmful words, constitute a serious charge of incapacity or misconduct."); *Union Pac. R.R. Co. v. Vill. of S. Barrington*, 958 F. Supp. 1285, 1300 (N.D. Ill. 1997) (allegation that plaintiff breached contract is not a serious charge of incapacity or misconduct that would support an action for defamation per se); *see also Makofsky v. Cunningham*, 576 F.2d 1223, 1236 (5th Cir. 1978) (assertion that buyer was "in default" of purchase agreement is not defamatory per se, "especially when, as here, [the words] are employed merely to claim a deposit made as a security for contractual performance."); *Williams v. Gulf Coast Collection Agency Co.*, 493 S.W.2d 367, 369 (Mo. Ct. App. 1973) (the general rule is that it is not defamatory per se to state that a person owes a debt which is long past due

where this charge does not affect the person in his business); *Patton v. Jacobs*, 78 N.E.2d 789, 790-91 (Ind. App. Ct. 1948) (statement that a person who is not a merchant owes a debt and refuses to pay is not defamatory per se); *Demmel v. Triumph of Europe, Inc.*, 208 N.Y.S.2d 463 (N.Y. Sup. Ct. 1960) (assertion that plaintiff failed to perform his contracts would not tend to hold plaintiff to ridicule or aversion and was not calculated to prejudice him in seeking a livelihood).[1]

The majority's decision is no more compelled by the general principles of the law of defamation than it is required by specific Illinois precedent. The law of defamation in Illinois is unremarkable: defamation tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with him. *See Tuite v. Corbitt*, 866 N.E.2d 114, 121 (Ill. 2006). Statements are defamatory per se when they impute inability or want of

---

[1] In *Quality Granite Constr. Co., Inc. v. Hurst-Rosche Eng'rs, Inc.*, 632 N.E.2d 1139 (Ill. App. Ct. 5th Dist. 1994), an Illinois court refused to overturn a jury's finding that a letter stating that the plaintiff "may be considered in default" was defamatory. *Id.* at 1143. However, in that case, the defendant also accused the plaintiff of failing "to complete the project in a timely manner, substandard workmanship, reluctance to complete punch list items and inability to interpret the contract documents, plans and specifications as bid." *Id.* at 1141. It is probably not irrelevant that the jury also found that the defendant's statement was made to pressure the plaintiff into forfeiting its claims for additional compensation. *Id.*

integrity in business, or in one's performance of employ-ment duties. *Id.* The mere recitation of this definition, however, does not settle much. At most, CIBC's statements are agnostic with respect to Giant Screen's "integrity" and its "business ability." Thus, it seems to me that we are required under Illinois' "innocent construction rule" to hold the statement to be non-defamatory. *See Tuite*, 866 N.E.2d at 121 (a statement is not defamatory if it is "rea-sonably capable of an innocent construction.").

The majority pays lip service to the innocent construc-tion rule, but dismisses as "unreasonable" any innocent interpretation of CIBC's statements. (Maj. Op. at 11.) I disagree. It seems to me that CIBC's statements are *obviously* (and reasonably) capable of innocent construc-tion. The innocent construction of its statements would be as follows: *Giant Screen did not perform an action required by contract; it may subjectively believe that performance wasn't due, and this belief may even be reasonable, or at any rate, excusable; however, its nonperformance has resulted in a loss to CIBC for which CIBC is entitled to insurance compensation*. Again, one doesn't have to strain to see this interpretation—this is more or less what CIBC actually said.

The innocent construction rule seems to embody the principle that courts should, where reasonable, strive to minimize the set of statements that can give rise to poten-tial tort liability. This makes a great deal of economic sense. The risk of taking unavailing breach of contract claims to be defamatory is that we will make it harder, rather than easier, for people in business to interact. Even

when the prospect of ultimately being found liable seems remote, as seems to be the case here, our law unnecessarily increases the cost of business if ordinary business communications have the potential to foist on speakers the cost of standing trial to prove that their statements were true, or were not reckless in their possible falsity.

In the light of all this, I think our decision today is ill-advised. It seems to me very likely that harsher words than the ones at issue here have passed between business associates without the parties coming to blows or contacting their lawyers. Again, because parties apparently rarely see the need to litigate over such trivialities, it is hardly clearly established as a matter of law that the words like "default" give rise to tort liability when they are embedded in sentences that might conceivably be false. In spite of this, the majority today holds what, to my knowledge, no court has ever held: namely, that one defames a business associate as a matter of law by saying that this associate is "in default." In assigning such treacherous consequences to the use of this rather bloodless and at any rate unremarkable word, the majority has dug a new and hidden pitfall for civil discourse among businesspeople. This result, in other words, is both imprudent and unnecessary. I respectfully dissent.